Barney and Ida Finestone, et al. [1] v. Commissioner. Finestone v. Comm'r
Docket Nos. 48767, 50079, 50080, 52426, 72197, 72198.
United States Tax Court
T.C. Memo 1960-164; 1960 Tax Ct. Memo LEXIS 124; 19 T.C.M. (CCH) 864; T.C.M. (RIA) 60164; August 17, 1960
L. Eugene McNatt, Esq., 45 Eighth Street, N.E., Atlanta, Ga., for the petitioners. Frederick T. Carney, Esq., for the respondent. FISHER
*124 Memorandum Findings of Fact and Opinion FISHER, Judge: This case is a consolidation of proceedings involving the following deficiencies in income tax and additions to tax [2] determined by respondent as follows: Additions to Tax, I.R.C. 1939
Docket No.
Year
Income Tax
Sec. 293(a)
Sec. 293(b)
Sec. 294(d)(2)
72198
1944
$12,309.78 **
$ 6,154.89
$ 27.52
1945
25,031.97
12,515.98
1,855.04
1947
13,606.68
6,803.34
878.52
50079
1946
27,166.52
13,583.26
1,729.93
50080
1948 *
6,737.56
3,368.78
360.93
48767
1949 *
1,275.06
$ 63.75
47.81
52426
1950 *
5,390.12
269.51
422.40
72197
1954 *
1,875.01
*125 The issues argued in this case are as follows: 1. Whether respondent was justified in the use of the net worth method and a modified bank deposits method in the respective years in which applied in determining deficiencies for said years. 2. Whether a part of the deficiency for each of the years 1944 to 1948, inclusive, is due to fraud with intent to evade tax. 3. Whether each of the returns for the years 1944 to 1947, inclusive, was false and fraudulent with intent to evade taxes. 4. Whether Barney omitted gross income in excess of 25 per cent of the amount stated in his return for 1946. 5. Whether assessment and collection of deficiencies *126 determined for each of the years 1944 through 1947, inclusive, are barred by the statute of limitations. 6. The extent to which error has been established in respondent's determination of deficiencies for each of the respective years in issue. 7. Whether additions to tax for negligence under section 293(a), I.R.C. 1939, are to be applied for the years 1949 and 1950. 8. Whether the addition for substantial underestimation of estimated tax under section 294(d)(2), I.R.C. 1939, is to be applied for each of the years 1944 through 1950. Findings of Fact General Some of the facts are stipulated or agreed upon by the parties and to the extent stipulated or agreed upon are incorporated herein by this reference. During each of the years in question the petitioners, Barney Finestone and his wife, Ida Finestone, were residents of Atlanta, Georgia. Barney filed individual income tax returns for the years 1944 to 1947, inclusive, with the then collector of internal revenue, Atlanta, Georgia, on which he claimed an exemption credit for his wife. These returns did not identify any income reported as being that of Ida. Joint returns for the years 1948 to 1950, inclusive, were filed *127 with the then collector of internal revenue, Atlanta, Georgia. A joint return for the year 1954 was filed with the district director of internal revenue, Atlanta, Georgia. Barney and Ida were both approximately 60 years of age in 1952 and had a good reputation in their community. Barney had been in the grocery business from 1919 until he became bankrupt in 1932. Ida operated the grocery business until it was sold in 1938 for an undisclosed price. On July 1, 1938, Barney bought a retail liquor store with the proceeds from the sale of the grocery business. After this purchase Barney had about $1,000 remaining. Barney filed a personal financial statement with an Atlanta bank showing a net worth of approximately $2,500 as of June 20, 1939. During the years 1939 through 1943, Barney borrowed various small amounts from an Atlanta bank, the balance due on such borrowings usually running well below $500. On January 1, 1943, Barney and his son, Harry Finestone, became partners in the liquor business. Barney thereafter had a two-thirds interest and Harry a one-third interest in the business which consisted of two retail liquor stores in Atlanta, known as "Barney's" and "Tubby's." This *128 liquor business was Barney's sole source of income except for small amounts of interest, dividends, and rents. Neither Barney nor Ida received any substantial sums of money by gift or inheritance. Ida took an active interest in the liquor business. She made many business bank deposits and met with the business' accountant from time to time. She handled most of the family financial matters. Barney furnished the funds for investments including those in Ida's name. Barney also furnished the funds which went into bank accounts in Ida's name. Ida filed no Federal income tax returns for the years 1933 to 1943, inclusive. Ida kept what money she had on deposit in banks. She only kept money at home for household expenses and did not keep money in lock boxes. Net Worth In April 1941, Ida opened savings account No. XXXX with the Fulton National Bank with an initial deposit of $35. The balance of the account at the end of each of the years 1941 to 1948, inclusive, was as follows: Year
Amount
1941
$ 65.07
1942
11.21
1943
3,005.55
1944
10,041.03
1945
7,258.83
1946
10,094.60
1947
12,812.98
1948
1,067.67 This account was closed on December 2, 1949. In *129 August 1944, Ida opened savings account No. XX8139 at the First National Bank of Atlanta, with an initial deposit of $1,000. The balance in this account at the end of each of the years 1944 to 1949 was as follows: Year
Amount
1944
$ 3,200.00
1945
7,424.28
1946
2,520.73
1947
13,433.08
1948
13,567.74
1949
13,568.07
On March 16, 1948, Ida opened special checking account No. XXXX at the Fulton National Bank and transferred $12,000 to the account from savings account No. XXXX. The balance in account No. XXXX on December 31, 1948, was $540.44. The Finestones possessed United States war savings bonds as follows: Amount Issued Each Year
Cumulative
Issued to
1942
1943
1944
1945
thru 1948
Barney or Ida Finestone
$318.75
$2,343.75
$ 6,356.25
$ 3,900.00
$12,918.75
Ida or Harry Finestone
0
300.00
1,425.00
4,031.25
5,756.25
Harry Finestone
18.75
0
0
0
18.75
Ida Finestone
37.50
0
0
0
37.50
Amount Acquired Each Year
$375.00
$2,643.75
$ 7,781.25
$ 7,931.25
$18,731.25
Forward Previously
$ 375.00
$ 3,018.75
$10,800.00
Acquired
Balance on hand at end of
$375.00
$3,018.75
$10,800.00
$18,731.25
Year
*130 The acquisition of these United States bonds in each of the above years was financed by the liquor business during that same year. The purchase price was not charged to Ida or Harry. On June 25, 1946, Barney purchased 300 shares of Progressive Club Company stock at a cost of $300 and owned these shares continuously through 1948. On August 22, 1946, Ida applied for an investor's certificate with Investor's Syndicate and made a payment of $330. A further payment of $3,479 was made on September 16, 1946, making the investment total $3,809 on December 31, 1946 and 1947. On February 16, 1948, an additional investment of $3,809 was made, making a total investment of $7,618 on December 31, 1948. Certificate No. S7-200310 covering the afore-mentioned investments was registered in the name of Ida S. Finestone as trustee for Barney Finestone. The certificate was surrendered on April 25, 1949, and $6,975 was paid to Ida as trustee. In February 1947, 100 shares of Allied Insurance Company stock were issued to Ida, the cost of which was $10,000. The stock was on hand on December 31, 1947, and December 31, 1948. The year or years in which the amounts totaling $10,000 were paid and the amounts *131 paid in each such year are not ascertainable from the record. On December 18, 1947, $3,000 in the form of a cashier's check was deposited with the Georgia Casualty and Surety Company for the purchase of stock. A stock certificate for 100 shares was issued in the name of Jack Zimmerman on June 4, 1948. This certificate was cancelled on May 31, 1950, and another certificate for 100 shares was issued in Ida's name. This investment was admittedly Ida's and was held by her on December 31, 1947. On May 28, 1948, Ida was issued 300 shares of Georgia Casualty and Surety Company stock. The amount of $9,000 was paid for such stock on or before the date of issuance. As of December 31, 1948, Ida had a total of $12,000 invested in Georgia Casualty and Surety Company. On May 5, 1947, Ida purchased 14 shares of National Linen Service Corporation 4 1/2 per cent preferred stock at a total cost of $1,470, which she paid in cash. On December 29, 1947, she purchased 200 shares of National Linen Service Corporation common stock costing $1,912.50 and on the same date she sold her 14 shares of National Linen 4 1/2 per cent preferred for $1,399.16. The amount by which the purchase price exceeded the sales *132 proceeds, $513.34, was paid in cash. The National Linen common stock remained in Ida's name through the end of 1948. On November 24, 1948, Ida purchased 200 shares of Consolidated Laundries Company common stock for $1,777.80 in cash. These shares remained in her name on December 31, 1948. Loans were made by Ida to Paul and Herman Schlossman. The unpaid balance at the end of each of the years 1945 to 1947, inclusive, was as follows: 1945
1946
1947
Paul Schlossman
$ 5,000.00
$ 2,000.00
None
Herman Schlossman
10,455.67
10,455.67
None The loans to Herman Schlossman were made in currency. The loan to Paul Schlossman was made in 1945. On September 15, 1947, Ida loaned $5,000 to Associated Investment Company which amount was unpaid on December 31, 1947, and December 31, 1948. On March 23, 1946, Ida withdrew $8,000 from savings account No. XX8139 at the First National Bank of Atlanta and loaned the money to a relative. This amount was outstanding on December 31, 1946, and December 31, 1947, and was repaid by check during 1948. Barney purchased a residence in 1940. His net equity in the house on December 31, 1943, through 1948, was as follows: Year
Amount
1943
$1,594.12
1944
1,834.63
1945
2,086.19
1946
7,500.00
1947
7,500.00
1948
7,500.00
*133 Barney owned an automobile during the years 1943 through 1948, the basis of which as of December 31st of each year was as follows: Year
Amount
1943
$1,270.00
1944
1,270.00
1945
1,270.00
1946
1,320.00
1947
2,304.50
1948
2,304.50
In 1948 a building located at 759 Marietta Street, Atlanta, Georgia, was purchased in Ida's name at a cost of $18,415.75, which amount was its basis as of December 31, 1948, without regard to allowable 1948 depreciation. From December 31, 1943, through December 31, 1946, Barney owed Jacob Schlossman $500. Barney had no other liabilities at the end of the years 1943 through 1946, and no liabilities at the end of 1947 and 1948. Attached hereto is Schedule A representing respondent's summary of his position under the net worth and expenditures method for the years 1944 to 1948, inclusive. So far as necessary to our own conclusions, we find it supported by the record except to the extent of the adjustments which we make in our opinion. Schedule A
RESPONDENT'S STATEMENT OF NET WORTH AND COMPUTATION OF NET INCOME [3]
ASSETS
Current
12/31/43
12/31/44
12/31/45
Savings Acct. #XX8139 1st N.B.
$ 3,200.00 *
$ 7,424.28 *
Savings Acct. #XXXX Fulton N.B.
$ 3,005.55 *
10,041.03 *
7,258.83 *
Checking Account #XXXX Fulton N.B.
Cash on Hand
0
0
0
Investments: U.S. Savings Bonds (1)
3,018.75 *
10,800.00 *
18,731.25 *
250 Shares Nat'l Linen Supply Co.
200 Shares Consol. Laundry
400 Shares Ga. Casualty & Surety Co.
200 Shares Allied Ins. & Finance Co.
Investor's Syndicate
Progressive Club
Notes Receivable
Paul Schlossman
5,000.00 *
Herman Schlossman
10,455.67 *
Assoc'd Investment Co., Inc.
Relatives - Other
0
0
0
Fixed
Home (net equity)
1,594.12 *
1,834.63 *
2,086.19 *
Auto
1,270.00 *
1,270.00 *
1,270.00 *
Building - 759 Marietta St., Atlanta,
Ga.
Depreciation Reserve
Proprietorship - B. & H. Finestone
16,604.75 n+
12,809.87 n+
32,588.22 n+
Total Assets
$ 25,493.17
$ 39,955.53
$ 84,814.44
LIABILITIES
Notes Payable - Jacob Schlossman
(500.00) *
(500.00) *
(500.00) *
NET WORTH
$ 24,993.17
$ 39,455.53
$ 84,314.44
Deduct Previous Year Balances
$ 24,993.17
$ 39,455.53
Increase in Net Worth
$ 14,462.36
$ 44,858.91
Add: Total non-deductible expenditures
18,085.17 n+
13,337.67 n+
Total
$ 32,547.53
$ 58,196.58
Deduct Interest on Savings Included in
(75.48)
(82.08)
Increase of Net Worth
NET INCOME
$ 32,472.05
$ 58,114.50
*134 Schedule A
RESPONDENT'S STATEMENT OF NET WORTH AND COMPUTATION OF NET INCOME ASSETS
Current
12/31/46
12/31/47
12/31/48
Savings Acct. #XX8139 1st N.B.
$ 2,520.73 *
$ 13,433.08
$ 13,567.74
*
*
Savings Acct. #XXXX Fulton N.B.
10,094.60 *
12,812.98 *
1,067.67 *
Checking Account #XXXX Fulton N.B.
540.44 *
Cash on Hand
0
0
3,500.00
Investments: U.S. Savings Bonds (1)
18,731.25 *
18,731.25 *
18,731.25 *
250 Shares Nat'l Linen Supply Co.
1,912.50 *
1,912.50 *
200 Shares Consol. Laundry
1,777.80 *
400 Shares Ga. Casualty & Surety Co.
3,000.00 *
12,000.00 *
200 Shares Allied Ins. & Finance Co.
10,000.00 *
10,000.00 *
Investor's Syndicate
3,809.00 *
3,809.00 *
7,618.00 *
Progressive Club
300.00 *
300.00 *
300.00 *
Notes Receivable
Paul Schlossman
2,000.00 *
0
0
Herman Schlossman
10,455.67 *
0
0
Assoc'd Investment Co., Inc.
5,000.00 *
5,000.00 *
Relatives - Other
8,000.00
8,000.00
0
Fixed
Home (net equity)
$ 7,500.00 *
$ 7,500.00 *
$ 7,500.00 *
Auto
1,320.00 *
2,304.50 *
2,304.50 *
Building - 759 Marietta St., Atlanta,
18,415.75 *
Ga.
Depreciation Reserve
(372.60)
Proprietorship - B. & H. Finestone
61,994.92 n+
53,789.51 n+
39,367.70 n+
Total Assets
$126,726.17
$140,592.82
$143,230.75
LIABILITIES
Notes Payable - Jacob Schlossman
(500.00) *
0
0
NET WORTH
$126,226.17
$140,592.82
$143,230.75
Deduct Previous Year Balances
84,314.44
126,226.17
140,592.82
Increase in Net Worth
$ 41,911.73
$ 14,366.65
$ 2,637.93
Add: Total non-deductible expenditures
23,152.83 n+
27,122.39 n+
30,721.51 n+
Total
$ 65,064.56
$ 41,489.04
$ 32,234.44
Deduct Interest on Savings Included in
(114.22)
(175.06)
(139.35)
Increase of Net Worth
NET INCOME
$ 64,950.34
$ 41,313.98
$ 32,467.69
*135 Modified Bank Account Method In addition to the net worth computations, Barney's income for 1946 through 1948 was also determined by respondent using the bank deposits method. [Admitted by petitioner.] The revenue agent and special agent assigned to this case made analyses of Barney's bank records including cancelled checks, deposit tickets, and bank statements, as well as the books of the B. & H. Finestone business and bank accounts and financial transactions carried in Ida's name. Attached hereto is Schedule B representing respondent's summary of his position in using the bank deposit method for the years 1946 to 1948, inclusive. So far as necessary to our own conclusions, we find it supported by the record except to the extent of the adjustments made in our Opinion. SCHEDULE B
CORRECTED OPERATING STATEMENTS [4] - 12/31/46 through 12/31/48
Calendar Year Ending 1946
Income
Cash on hand - Ending
$ 11,383.49 n[*] Period - Add
Cash on hand - Beginning
520.86 n[*] $ 10,862.63
$ 10,862.63
Period - Deduct
Gross deposits to
$380,640.79 *
business account
Less: Book exchanges & bank
$ (3,719.41) *
charges
Exchanges in drawings
(6,272.78) *
Exchanges disallowed -
reverse
Return of capital
(3,000.00) *
(12,992.19)
367,648.60
Payrolls disbursed in
cash
Personal income -
$ 5,683.00
unidentified
Other business income -
$ 66.35
66.35
5,749.35
per books
Gross Business Receipts
$384,260.58
Deductions from Income
Cost of Goods sold
Inventory - opening
$ 25,398.82 n[*] period
Purchases
323,769.22 n[*] $349,168.04
Less: Closing Inventory
$ 46,575.55 n[*] 302,592.49
Gross Business Profit
$ 81,668.09
Other Business Expenses
Per check analysis
$ 17,617.24 n[*] Audit Adjustment
200.00
$ 17,817.24
Audit Adjustment
$ (791.14)
Audit Adjustment
(308.35)
$ (1,099.49)
$ 16,717.75
(Depreciation)
Net Business Profit
$ 64,950.34
Calendar Year Ending 1947
Income
Cash on hand - Ending
$ 3,340.59 n[*] Period - Add
Cash on hand - Beginning
11,383.49 n[*] $ (8,042.90)
$ (8,042.90)
Period - Deduct
Gross deposits to
$353,681.67 *
business account
Less: Book exchanges & bank
[31,753.13) *
charges
Exchanges in drawings
(18,635.01) *
Exchanges disallowed -
3,550.00 *
reverse
Return of capital
(46,838.14)
306,943.53
Payrolls disbursed in
$ 1,409.70
cash
Personal income -
20,637.50 n[*] unidentified
Other business income -
$ 260.27
260.27
22,307.47
per books
Gross Business Receipts
$321,108.10
Deductions from Income
Cost of Goods sold
Inventory - opening
$ 46,575.55 n[*$ period
Purchases
263,747.60 n[*] $310,323.15
Less: Closing Inventory
$ 50,775.25 n[*] 259,547.90
Gross Business Profit
$ 61,560.20
Other Business Expenses
Per check analysis
$ 20,663.93 n[*] Audit Adjustment
(200.00)
Audit Adjustment
(222.56)
Audit Adjustment
4.85
$ 20,246.22
20,246.22
(Depreciation)
Net Business Profit
$ 41,313.98
Calendar Year Ending 1948
Income
Cash on hand - Ending
$ 4,002.13 n[*] Period - Add
Cash on hand - Beginning
3,340.59 n[*] $ 661.54
$ 661.54
Period - Deduct
Gross deposits to
$249,086.89 *
business account
Less: Book exchanges & bank
$ (2,749.75) *
charges
Exchanges in drawings
(200.00) *
Exchanges disallowed -
reverse
Return of capital
(2,949.75)
246,137.14
Payrolls disbursed in
$ 11,213.22 n[*] cash
Personal income -
11,027.80
unidentified
Other business income -
$ 44.58
44.58
22,285.60
per books
Gross Business Receipts
$269,084.28
Deductions from Income
Cost of Goods Sold
Inventory - opening
$ 50,775.25 n[*] period
Purchases
198,550.89 n[*] $249,326.14
Less: Closing Inventory
$ 36,664.19 n[*] $212,661.95
Gross Business Profit
$ 56,422.33
Other Business Expenses
Per check analysis
$ 25,542.36 n[*] Audit Adjustment
Audit Adjustment
(1,614.81)
Audit Adjustment
27.09
$ 23,954.64
23,954.64
(Depreciation)
Net Business Profit
$ 32,467.69
*136 Miscellaneous The following amounts of interest were credited to Ida's savings accounts and were not reported on Barney's returns: Year
Amount
1946
$114.22
1947
175.06
Barney participated with his accountant in taking the partnership inventories and received an adding machine tape showing the amounts of the inventory. He furnished his accountant the invoices and figures for purchases and sales sometimes weekly or less often. On some occasions when Barney went to the accountant's office and found the door locked he would throw the data over the transom. All of Barney's sales to customers were paid for by cash or check. On weekends, Barney cashed a good number of payroll checks. Barney paid for all his merchandise by check drawn on his business bank account, and was the only person who drew checks for the business and was at all times aware of the status of the drawings on the business bank account. The 1946 journal of B. & H. Finestone contains an October entry (with no specific date) debiting *137 the general ledger for cash and crediting Barney's proprietorship account for $25,000. The journal contains the following explanation: "Capital contributed as per advice of Mr. Barney Finestone." Barney's accountant was questioned by the revenue agent concerning this entry and referred the agent to Barney for information. Barney, when questioned, gave no explanation of this entry. The 1947 journal of the partnership contains an October entry (without any specific date) debiting the general ledger for cash and crediting Barney's drawing account for $19,800.79, with the following explanation: "Loans paid back." When questioned about this entry, the accountant told the revenue agent that it was made after consulting with Barney and that the agent would have to see Barney for any further explanation. Barney gave no explanation. During the period June 22 to September 12, 1947, Barney made 9 cash withdrawals from the partnership totalling $25,324.18, and paid $19,800.79 into the business in that year. The 1948 partnership journal contains a December 31st entry debting the general ledger for cash and crediting Barney's drawing account for $8,000. The accountant who kept the partnership *138 books and prepared Barney's individual income tax returns for the years 1946 to 1950, inclusive, was a registered public accountant under the laws of Georgia. The 1946, 1947, and 1948 returns were stamped with the legend "Compiled from figures and information furnished by taxpayer." On January 30, 1952, Barney and respondent's representative signed a consent (Form 872) agreeing to extend the period of assessment for taxable year 1946 until June 30, 1953, and providing that if a deficiency notice were sent on or before such date the time for assessment should be extended to 60 days beyond the date the respondent is prohibited from making an assessment. This agreement was signed more than three, but less than five years after the return was due. A notice of deficiency for the year 1946 was sent to Barney on June 29, 1953. During 1949, Ida received unreported interest income of $103.16. Respondent has credited the following payments of estimated tax for the years 1944 through 1947 to Barney, and for the years 1948 through 1950, to Barney and Ida: Amount of
Tax stated on
estimated
return for
Year
payments
prior year
1944
$1,294.00
1945
1,752.08
$1,752.66
1946
5,200.00
7,637.50
1947
3,000.00
6,865.59
1948 *
2,000.00
4,035.27
1949 *
1,277.94
1,277.94
1950 *
799.74
799.74
*139 There was no change in petitioners' status with respect to personal exemption and credit for dependents in the years 1948 through 1950. During 1950, Barney's liquor store was sold for $30,000, and a long-term capital gain of $28,406.64 was reported on the partnership return. Barney had a two-thirds interest in such gain. 1954 In December 1949, Barney and two other persons acquired the Star Liquor Co., Inc., which owned a liquor store in Atlanta, Georgia. The corporation was dissolved in 1950. Barney and his two associates then operated the store as a partnership. Barney and Ida's joint return for 1954 computed profits from the Star store after amortization in the sum of $7,894.68 had been taken by the partnership. The amortization deduction was claimed in relation to the purchase of a leasehold for $45,000 at or after the time of the purchase of Star Liquor Co., Inc. Respondent's notice of deficiency stated: "Leasehold cost representing capital asset pertaining to renewal right to obtain liquor license, held to be intangible in nature and not subject to depreciation, depletion or amortization." Fraud and Limitations A part of the deficiency *140 for each of the taxable years 1946 and 1948 is due to fraud with intent to evade tax. Barney filed a false and fraudulent income tax return for the taxable year 1946. Opinion Source of Funds During the taxable years in question, the income of Barney and Ida Finestone was derived from one significant source, the liquor business established in 1938. Ida had no individual income of consequence subsequent to her sale of the grocery business in 1938; she filed no Federal income tax returns from 1933 through 1943, inclusive; and she was listed on Barney's returns for the years 1944 to 1947, inclusive, as a dependent for the purpose of claiming an exemption credit. Barney has testified that Ida continued to collect old accounts receivable after she sold the grocery business, but the amount of these collections was not estimated. We cannot conceive of any substantial collectible accounts in 1944 since the store was sold in 1938. Ida kept no sums of cash in lock boxes and kept no significant amounts of cash at home. She kept all cash, other than for household purposes, in bank accounts. Ida did not inherit or receive by gift any substantial amount of money. The record discloses that *141 at the end of 1943 the Finestones held about $6,000 in savings accounts and United States savings bonds. It is clear, therefore, that Ida had no personal "hoard" other than her bank accounts and bonds at the beginning of the taxable years in question. Since Ida had no significant source of income other than that which Barney gave her from the liquor business during the years in question, any property acquired by her during these years must be attributed to income from that business. In Robert Leslie Bowlin, 31 T.C. 188 (1958), affd. on another issue, 273 F. 2d 610 (C.A. 6, 1960), rehearing granted (C.A. 6, 1960), we held that, for the purposes of the fraud addition, certain property nominally owned by the wife was derived from her husband's income. We stated therein at p. 205; "In short, it is not the place of purchase, or even the identity of the person who physically made the purchase, which is significant, but the course of the funds used in making the purchase. And with respect to Ann, the evidence strongly indicates that she was without any substantial funds and had little, if any, income. In fact, the record is persuasive that her income was limited *142 to such small amounts of interest as might have accrued on her two small savings accounts. Support for such a conclusion is to be found in the fact that Bowlin, on his income tax returns, claimed Ann as a dependent for all of the years herein, * * *" As for Barney, the record indicates that he was bankrupt in 1932 and purchased the liquor business in 1938 with funds derived from Ida's sale of a grocery business. At the time of his purchase of the liquor business, Barney had about $1,000 remaining in his own estimation. In June 1939, Barney applied for a bank loan and stated a net worth of about $2,500. From 1939 through 1943, Barney borrowed various small amounts from a bank. He testified that he had no income from sources other than the liquor business. Barney did not inherit or receive as a gift any substantial amount of money. He did not borrow any substantial amounts. From this record it is clear that Barney had no "hoard" prior to the years in issue. Burden of Proof of Fraud Use of Net Worth and Bank Deposit Methods Respondent urges that Barney's returns for the years 1944, 1945, 1946, and 1947, and Barney's and Ida's joint return for 1948, understated income and that *143 all or a part of the deficiencies arising therefrom were in each of these years due to fraud with intent to evade tax within the meaning of section 276(a) of the Code of 1939. In order to sustain his burden of proof with respect to fraud, respondent must prove fraud on the part of petitioner by clear and convincing evidence. The mere allegation of fraud is of no weight and mere suspicion of fraud and doubts as to the intention of the taxpayer are insufficient. John Marinzulich, 31 T.C. 487, 493 (1958). In attempting to prove fraud, respondent has relied upon the net worth method for the years 1944 and 1945. It was proper to make use of the net worth method even though petitioner's books and records in general (but subject to exceptions referred to infra) appeared adequate on their face. See Estate of W. D. Bartlett, 22 T.C. 1228 (1954); Morris Lipsitz, 21 T.C. 917 (1954), affd. 220 F. 2d 871 (C.A. 4, 1955), certiorari denied, 350 U.S. 845 (1955), where we said (p. 930): "And when the increase in net worth is greater than that reported on a taxpayer's returns or is inconsistent with such books or records as are maintained *144 by him, the net worth method is cogent evidence that there is unreported income or that the books and records are inadequate, inaccurate, or false. It is not correct to say that the use of the net worth method is forbidden where the taxpayer presents books from which income can be computed, for the net worth method itself may provide strong evidence that the books are unreliable. * * *" See also Holland v. United States, 348 U.S. 121 (1954), rehearing denied 348 U.S. 932 (1955). What we have said above with respect to the net worth and expenditures method applies as well to the bank deposit method used in addition to the net worth method for the years 1946 to 1948, inclusive. Fraud Issue - 1944 In approaching the fraud issue for 1944, it is to be noted that respondent, who has the burden of proof, has established no irregularities in the partnership books of B. & H. Finestone, and has proved no overt or affirmative acts indicating fraud or fraudulent intent with respect either to petitioner's business or personal affairs. We add that respondent now admits that the partnership was bona fide, and that for the year in question, petitioner's capital account *145 and distributive share of the partnership earnings as originally included in respondent's net worth statement must be reduced to reflect the like interests of his son (and partner) Harry. On the other hand, for the reasons discussed, supra, in computing Barney's income on the net worth and expenditures basis, the assets of his wife Ida are to be included in opening and closing net worth. For convenience of discussion and contrast with respondent's position as disclosed by his proposed net worth statement ( Exhibit A, supra,) we attach our own computation of net worth increases for 1944 and 1945 (the latter year for the purpose of discussion, infra.). Computation of Net Worth and Net Income - Barney
For Years 1944-1945
Assets
12/31/43
12/31/44
12/31/45
(s) Ida - Savings Acct. #XX8139
$0
$ 3,200.00
$ 7,424.48
(s) Ida - Savings Acct. #XXXX
3,005.55
10,041.03
7,258.83
(e) Cash on hand
0
0
0
(s)(e) U.S. Savings Bonds
3,018.75
10,800.00
18,731.25
(s) Ida - Note Receivable - Paul
5,000.00
Schlossman
(s) Ida - Note Receivable - Herman
10,455.67
Schlossman
(s) Home (Net Equity)
1,594.12
1,834.63
2,086.19
(s) Auto
1,270.00
1,270.00
1,270.00
(e) Proprietorship
11,005.92
3,468.86
13,795.97
Total Assets
$19,894.34
$30,614.52
$66,022.39
Less: Liabilities
(s) Jacob Schlossman - Note Payable
(500.00)
(500.00)
(500.00)
Net Worth
$19,394.34
$30,114.52
$65,522.39
(19,394.34)
(30,114.52)
Increase in Net Worth
$10,720.18
$35,407.87
*146 Items in our net worth statement preceded by the letter (s) are stipulated or agreed. It is to be noted, however, that items in Ida's name and items involving United States savings bonds are stipulated as to amount only, since petitioner argues that the items in Ida's name and at least some of the bonds should not be taken into consideration in determining his net worth increases. Items preceded by the letter (e) require explanation. The item referred to as representing nondeductible expenditures in respondent's proposed net worth statement will be discussed infra. We have disregarded an adjustment of $75.48 for interest included in net worth because it does not reflect significantly on the fraud issue. We have taken "cash on hand" at zero in both the opening and closing net worth. The testimony clearly establishes that there was no substantial cash on hand at either time, and that, in fact, the only such cash was a small amount kept for household use. The amount is not significant, and washes out from beginning to end whether included in an estimated amount or not. The United States savings bonds are included as assets of Barney because the evidence establishes that they were *147 paid for out of the funds of the partnership and were not charged in whole or in part to Ida or Harry. As to Barney's proprietorship account, we have eliminated Harry's interest therein on the basis of respondent's concession of the partnership issue. We have also eliminated the automobile item, having included it as a separate item in our net worth statement. There is also a minor adjustment adding back to Barney's proprietorship account $211.67 as of December 31, 1943, and $423.34 as of December 31, 1944, reflecting disallowance of auto depreciation on the theory, arguendo, that the auto was for Barney's personal use. We wish it understood that we are not passing on the merits of the adjustments relating to the automobile. We include them for clarity and completeness. They are too controversial to have any significance in relation to the fraud issue. On the basis of our net worth statement and the foregoing explanations (and deferring for discussion infra the effect of alleged nondeductible expenditures) we find a net worth increase for 1944 in the amount of $10,720.18. Petitioner, however, reported net income of $8,053.51, leaving tentative unreported net income of $2,666.67. *148 We now turn to the effect, if any, of the alleged nondeductible expenditures. Respondent calculates these to be a total of $18,085.17. We have made adjustments to this total which reduces it to a total of $17,226.71 by eliminating Harry's withdrawals of $795.46 on the basis of respondent's concession as to the bona fides of the partnership, and by eliminating a further item of state income taxes of $63. The latter item need not be discussed since it is not significant on the fraud issue. Respondent adds the so-called nondeductible expenditures to the increase in net worth, and, in effect, treats them as additional income. Here, the amounts in question simply represent Barney's withdrawals from the partnership, charged in part to his capital account and part to his drawing account. The label given to the item is, of course, not determinative, and the use of the words "nondeductible expenditures" demonstrates neither the facts nor the principle relied upon. The situation here presented is further complicated by the fact that a partner is taxed on his distributive share of partnership net income whether distributed or not, and, at the same time, withdrawals, which may be equal *149 to, or greater, or less than his distributive share, are not taxable as such, and do not affect the determination of the distributive share. As stated above, the withdrawals in question for 1944 as determined by us (and added to income by respondent as nondeductible expenditures) totalled $17,226.71. Respondent has established payment of Federal income taxes of $1,582.75 and this is obviously nondeductible. It is clear, also, that petitioner must have had some nondeductible personal living expenses but respondent has not established even an approximation of the amount thereof. Our observation of Barney and Ida at the trial, and our consideration of the vague references in the testimony relating to their background suggest that they lived quite frugally. No amount being established, we select $4,000 as personal living expenses for 1944, not as a fact, but to illustrate and complete our discussion. We at least doubt that their 1944 personal living expenses were any higher. We think it reasonable to infer that the otherwise unaccounted for increase in net worth of $2,666.67 stemmed from the withdrawals. At least, respondent has failed to establish to the contrary. We think that this *150 amount should not be carried back into income because it is already reflected in increased net worth and would result in a pro tanto duplication of income. There are several other minor expenditures which should be added back to income but they are too small to warrant discussion since they would not affect the fraud issue. There is no evidence supporting the treatment of the remainder of the withdrawals as nondeductible expenditures and respondent does not claim they represent year-end assets. We come to the point, therefore, where we have found that there is some evidence of a conjectural understatement of income for 1944, consisting of the following: Unexplained increase in net worth
$2,666.67
Federal income taxes
1,582.75
Personal living expenses (for illustration only)
4,000.00
Minor items not discussed above
344.06
Total
$8,593.48
We must weight the foregoing in the light of the fact that there were no irregularities on the partnership books or specific acts affirmatively indicating fraud, and that the evidence applicable to 1944 furnishes no basis for a clear inference of fraud. Under the circumstances, we hold that respondent has not proved *151 fraud for the year 1944 by clear and convincing evidence. Fraud Issue - 1945 The approach to the fraud issue for 1945 is similar in principle to that of 1944. Repetition will be avoided to the extent possible. Here, again, no irregularities are found in the partnership books and there are no affirmative overt acts indicating fraud or fraudulent intent. Our net worth statement will be found supra in connection with the discussion of the year 1944. What we had to say about respondent's concession of the validity of the partnership and adjustments for Harry's interest, and our comments relating to items in Ida's name, to the United States savings bonds, and cash on hand, are equally applicable in principle to 1945. Leaving for discussion the effect of alleged nondeductible expenditures in 1945, we find a net worth increase for that year of $35,407.87. Petitioner, however, reported net income of $21,049.11 for 1945, leaving tentative potential unreported net income of $14,358.76. Respondent's net worth statement alleged nondeductible expenditures of $13,337.67, which actually stemmed from Barney's withdrawals from the partnership. Respondent treats these as income. By minor *152 adjustments not affecting the fraud issue, we have reduced these withdrawals to $11,721.77. Disregarding items too small to have significance on the fraud issue, these withdrawals were used in part for Barney's Federal income taxes ($1,534.81) and auto expense ($518.57). The auto expense item is included arguendo and for reasonable completeness. We are not to be understood as ruling on it on the merits except to say that it is not of itself indicative of fraud. Deducting these two items from the total withdrawals (subject to minor adjustments too small to make any difference), we have the remainder of withdrawals of $9,668.39. No doubt some part of this remainder was used for living expenses, but respondent has proved no particular amount thereof. With no affirmative evidence produced by respondent, we select $4,000 as living expenses for the reasons indicated in discussing 1944 and largely for the purpose of illustration. Accepting this figure, in the absence of a better one, we deduct it from the remainder figure of $9,668.39 to leave $5,668.39 unaccounted for. Respondent has offered no evidence that the unaccounted for amount of $5,668.39 represented nondeductible expenditures. *153 We think that it is more reasonable to infer that it accounts for a part of the otherwise unexplained increase in net worth. In all events, it could have been so applied and respondent has offered no evidence to the contrary. To add it back to income under the circumstances would at least risk duplication of income. We need not summarize the figures above discussed. For the same basic reasons referred to in discussing the year 1944, we conclude that respondent has not established fraud for the year 1945 by clear and convincing evidence. Fraud Issue - 1946 Respondent has made separate computations - one on the net worth and expenditures method and the other on the bank deposit and application of funds method - for 1946 (and also for 1947 and 1948). We have considered both, but find it necessary to discuss only the latter method in reaching our conclusions for each of these years. For convenience, we begin our own analysis by examining respondent's computation which will be found in Schedule B of our Findings of Fact. Most of the items are stipulated or agreed upon and are indicated by the symbol (s). Items taken from the books (and not in dispute) are indicated by the symbol *154 (b). Our views on the remaining items are set forth in our discussion. In reaching the figure of $384,260.58 as gross business receipts, all items in Schedule B for 1946 are stipulated or agreed upon in amount except two. One item, in the amount of $5,683, is listed as "personal income - unidentified." The amount represents cash deposits in Ida's savings accounts. For reasons to be discussed infra, we think it is properly taken as an income item. The other item of $66.35 represents salaries paid in merchandise. It is too small to be significant on the fraud issue. Cost of goods sold is taken from the books of the partnership and is not contested. Under "Other Business Expenses," the item of $17,617.24 has been taken from the partnership books and is agreed upon. The deduction of $200 was taken out of 1947 and was allowed in 1946. The item referred to as "Audit Adjustment" in the amount of $791.14 is contested but can be disregarded on the fraud issue. The same may be said of the item of $308.35 referred to as "Audit Adjustment (Depreciation)." The ultimate figure of net business profit in the amount of $64,950.34 is a matter of calculation. Barney's share thereof was two-thirds *155 or $43,300.23. Barney reported $22,809.20 as his share of partnership income, leaving an unreported balance on the above calculation of $20,491.03. Agreeing that the results of the bank deposit method are not to be taken as precisely accurate, and also that we have not passed on the merits of minor adjustments, we think respondent has demonstrated an understatement of income by Barney for 1946 in the approximate amount of $20,000. This brings us to the basic question of whether fraud has been established for that year by clear and convincing evidence. In passing, we must recall that fraud is seldom demonstrated by direct evidence, and that clear and convincing proof of fraud may be adduced in a proper case by circumstantial evidence. Here, we think respondent has met his burden. In the first place, we think an understatement of approximately $20,000, under the circumstances of this case, is so substantial as to preclude the inference that it was omitted due to oversight. See Estate of Joseph Nitto, 13 T.C. 858, 869 (1949). In 1946, moreover, there are other circumstances supporting an inference of fraud. We have referred, supra, to cash deposits in Ida's savings *156 accounts totalling $5,683. The record forecloses any reasonable possibility of Ida procuring these funds from anyone other than Barney. She had no substantial cash of her own at that time and Barney was her only source. It is clear that Ida did not withdraw and redeposit these items. As far as Barney is concerned, the item must be considered in connection with the debit to cash and credit to his drawing account of $25,000 in October of 1946 described as "Capital Contribution as per advice of Mr. Barney Finestone." (This item is not set forth separately in Schedule B, but is a part of gross deposits to business account.) The two items in question total $30,683. No entries on the books of the partnership or in the records of any banks in which the partnership or Barney or Ida were depositors show withdrawals in any way furnishing a clue to the source of these funds. Barney's withdrawals from the business for 1946, while substantial in the aggregate, reflect largely small individual amounts, all for specified purposes. The record forecloses the possibility of any such nontaxable sources as gift (except from Barney to Ida), inheritance, or borrowing. We must conclude, therefore, that the *157 amounts in question stemmed from income sources. The only source of such income was the partnership, and the reasonable inference is that the funds represented income of the partnership not recorded on its books. Although emphasized at the trial (especially the $25,000 item), no explanation was offered by petitioner. The accountant who made the entry was dead at the time of the trial, but had been questioned by the agents as one of Barney's representatives at the time of the investigation and merely referred them to Barney. Barney has offered no explanation. We recognize, of course, that the burden of proof of fraud rested with respondent, but the failure to explain is a factor to be considered. As the Court of Appeals said in W. A. Shaw v. Commissioner, 252 F. 2d 681 (C.A. 6, 1958), affirming 27 T.C. 561, the failure to testify [here the failure to explain] "resulted in a record which presented no explanation as to circumstances requiring explanation." The respondent has, in our opinion, presented clear and convincing evidence of fraud, and petitioner has failed to go forward with the evidence by offering his explanation if any there was. We hold *158 that for 1946 a part of the deficiency is due to fraud with intent to evade taxes, and that Barney's return for that year was false and fraudulent. Fraud Issue - 1947 As we did with respect to 1946, we begin our own analysis by examining respondent's computation, also found in Schedule B supra. The items stipulated or agreed upon are indicated by the symbol (s). The items taken from the books (and not in dispute) are indicated by the symbol (b). Our views on the remaining items are set forth in our discussion. In reaching the figure of $321,108.10 as gross business receipts, all items except three are stipulated or agreed upon, or taken from the books without dispute. The first of the three items to be considered is in the amount of $1,409.70 representing payroll disbursed in cash but not reflected in receipts. We agree with respondent that it must be reflected in receipts to offset the corresponding deduction of expense. To treat it otherwise would, in effect, allow a double deduction. The second item is in the amount of $20,637.50 which purports to be unidentified personal income. Part of the item, in the amount of $10,000, will be discussed infra. The remaining $10,637.50 *159 represents deposits in Ida's bank accounts and cash paid for investments. Respondent argues that the amounts totalling $10,637.50 must have derived from the business, through Barney, and must be treated as representing income received by him on the theory that there was no other source to him except unreported business earnings. We question the validity of this contention, at least in part, because unlike 1946, Barney had made 9 cash withdrawals totalling $25,324.18 from the business in the period of June 22 to September 12, 1947. He also paid into the business $19,800.79 in that year (see discussion infra) leaving a balance of $5,523.39 not derived from a taxable source which may have been turned over by him to Ida. The burden rests with respondent to show that Ida's deposits and investments did derive from a taxable source. Nevertheless, since it will not affect our conclusion for 1947, we include, arguendo, the full amount of the $10,637.50 as representative of receipt of business income. We take a different view, however, with respect to the $10,000 item which purports to represent payment of that amount, in 1947, for Allied Insurance and Finance Company stock. Again, the burden *160 is on respondent. The parties agree that the cost of the stock was $10,000 and that it was put in Ida's name in 1947. Barney, however, testified that the stock was paid for in installments over a period of several years, at least partially prior to 1947. Respondent failed to prove what part, if any, was paid in 1947. Respondent contends that Barney admitted that the consideration was all paid in 1947 but the record does not support this view. The only evidence is that of one of the agents who testified he put to Barney a question and received an answer as follows: "We have tentatively set up a $10,000 investment in Allied Insurance; does that sound correct?" His answer was "Yes." We think this fails to sustain respondent as to the amount if any paid in 1947. As to the $10,000 item, we will adjust accordingly when we reach the ultimate figure of net business profit. The third item under discussion is "Other business income - per books" in the amount of $260.27. This represents salaries paid in merchandise and is necessary to reflect income correctly. It could not materially affect the fraud issue. Items determining cost of goods sold in the amount of $259,547.90 are taken from *161 the books, leaving gross business profit of $61,560.20, subject to the $10,000 adjustment referred to above. Of the other business expenses, the item of $20,663.93 is taken from the books. The first "audit adjustment" of $200 reflects the transfer of an item from 1947 to 1946. The second "audit adjustment" of $222.56 is not significant on the fraud issue and the same may be said of the "audit adjustment - depreciation" in the amount of $4.85. From the foregoing, net business profit is calculated at $41,313.98. We reduce this by $10,000 on the basis of our discussion, supra, of the Allied Insurance and Finance Company stock purchase, adjusting net business profit to $31,313.98. Barney's share of this is $20,832.65. He reported $16,636.30, leaving a conjectural amount of unreported income in the amount of $4,196.35. We not only think this amount is not substantial enough under the complex circumstances here presented to preclude honest error, but we point out that such apparent error might be fully explained on the basis of our discussion, supra, of the $10,637.50 item included under unidentified personal income. Respondent urges us to find fraud because of the item of $19,800.79 *162 described as "Loan paid back." The item is debited to cash and credited to Barney's drawing account. Respondent uses substantially the same argument as that presented in relation to the $25,000 item in 1946, with respect to which we sustained his position. The circumstances are quite different in 1947, however. In 1946, the evidence foreclosed any source other than income for the $25,000 amount. As to the $19,800.79 in 1947, however, sources of funds other than income were available to Barney since, as stated above, he made cash withdrawals of $25,324.18, during the relatively short period of June 22 to September 22, 1947. Under the circumstances, we hold the respondent has failed to establish fraud for 1947 by clear and convincing evidence. Fraud Issue - 1948 The problem here is similar in principle to that presented for 1946. We have examined both the net worth and bank deposit approach but again confine our discussion to the latter. We again begin our analysis by examining respondent's computation in Schedule B of our Findings. The same symbols are used to indicate items which are stipulated or agreed upon, and items taken from the books, and set forth our views on the remaining *163 items in our discussion. In reaching the figure of $269,084.28 as gross business receipts, all items in Schedule B for 1948 are stipulated or agreed upon in amount except three. One item, in the amount of $11,213.22, represents payrolls disbursed in cash. The burden of proof is on respondent. The books and records are not altogether consistent. We find affirmative evidence supporting the inference of payrolls disbursed in cash in the amount of only $8,492.80, leaving an amount not accounted for of $2,720.42. This amount is not determinative of our ultimate conclusion on the fraud issue, but we adjust nevertheless when we reach the final figure of net business profit for the purpose of the fraud issue. The next item is "personal income - unidentified" in the amount of $11,027.80. This item may be broken down into the following: Cash deposits to Ida's savings account #XXXX
$ 2,750.00
Cash deposits to Ida's checking account #XXXX
500.00
Ida's cash purchase of Consolidated Laundries stock
1,777.80
Ida's purchase of Georgia Casualty and Surety stock
9,000.00
$14,027.80
Less: Exchanges
3,000.00
Net
$11,027.80
As to this item, we think respondent has *164 fully met his burden of proving that the net amount of $11,027.80 is to be treated as income. The record forecloses any reasonable possibility of Ida procuring these funds from anyone other than Barney. Moreover, the 1948 return was a joint return. Other payments to Ida during the year were obviously for household purposes and do not explain the so-called unidentified income. Ida had no substantial cash of her own available for said deposits and purchases of stock. The only inference we can draw from the evidence is that the amount represents unreported and unrecorded income of Barney which he passed along to Ida. Again, as in 1946, petitioners offer no other explanation. The third item "other business income per books" is only $44.58, representing salaries paid in merchandise. With respect to the deductions from income, the figures representing cost of goods sold are taken from the books. Under "other business expenses," the item of $25,542.36 allowed by respondent is taken from the books. The audit adjustment of $1,614.81 represents a total of minor personal expenses charged to the business and miscellaneous unsupported cash expenses. The audit adjustment (depreciation) in *165 the amount of $27.09 is an adjustment favorable to taxpayer. On Schedule B, respondent, on the basis of his computations, reaches a net business profit of $32,467.69. We reduce this by $2,720.42 to represent that portion of cash payroll disbursements which, in accordance with our discussion, supra, we eliminate because of respondent's failure, to that extent, in meeting his burden of proof. This leaves a net business profit, as adjusted by us, of $29,747.27. Barney's share of this was two-thirds, or $19,831.51. The joint return for 1948 reported $9,589.90 as Barney's share of partnership income, leaving an unreported balance of $10,241.61. This brings us to the question of whether respondent has proved fraud by clear and convincing evidence. We hold that he has. We are satisfied that there was an understatement of approximately $10,000 and, from all of the circumstances established in the record, that there is no basis for an inference that it was due to oversight. The circumstances of Ida's deposits and investments in a net amount of $11,027.80 clearly point to a wilful failure to record or report a corresponding amount of income. In addition to the foregoing, the partnership *166 books contain a December 31 entry debiting cash and crediting Barney's proprietorship account in the amount of $8,000. This item is a part of gross deposits to business account in Schedule B. The item is quite similar to the $25,000 item discussed in relation to 1946. Again the record forecloses any reasonable possibility that the source of the item was anything but income which had not been recorded or reported as such. If there is any other acceptable explanation, petitioners have not offered it. We, accordingly, hold that respondent has presented clear and convincing evidence that part of the deficiency for 1948 was due to fraud with intent to evade taxes. Limitations The issue of limitations is raised for each of the years 1944 to 1947, inclusive. Resolution of the issue is dependent upon our determination of the question of fraud, except as to the year 1946 where respondent claims, in the alternative, that section 275(c) is applicable. Since we found that respondent failed to establish fraud in the years 1944, 1945 and 1947, it follows that each of said years is barred by limitations. Conversely, since we found fraud in 1946, that year is not barred, and we need not consider *167 the applicability of section 275(c). Deficiency Issues 1946 Respondent originally determined that Barney's income from the liquor business in 1946 was $64,950.34. On brief, respondent conceded that a valid partnership existed between Barney and Harry and that therefore only two-thirds of the liquor business profits were attributable to Barney. Respondent's corrected determination was that Barney's 1946 net income amounted to $41,777.16. This amount reconciles with our computation for 1946 under the fraud issue for that year after allowance for undisputed deductions claimed on the return and adjustments made by respondent in his statutory notice relating to interest and contributions. The items in the bank deposit analysis which have not been stipulated or agreed upon have been discussed in our treatment of the fraud issue for 1946, supra. That discussion is equally applicable here with the important distinction that the burden of proof of error rests with petitioner on the question of deficiencies but was on respondent on the fraud issue. Except with respect to the adjustments which respondent now concedes should be made, petitioner has failed to meet the burden of proof *168 of error on the part of respondent. The appropriate adjustments will be reflected in the Rule 50 computation. 1948 Respondent originally determined that Barney's income from the liquor business in 1948 was $31,783.38. On brief respondent conceded the existence of a valid partnership between Barney and Harry and that therefore only two-thirds of the profits were attributable to Barney. Respondent's corrected determination was that Barney and Ida had net income of $20,554.42 in 1948. Here, again, the burden is upon petitioners to prove error in respondent's determination. In discussing the fraud issue, where the burden was upon respondent, we made an adjustment of $2,720.42 in the item of payrolls disbursed in cash because of respondent's failure to support that amount by affirmative evidence. We did not, however, find that respondent's determination was in error on this item. Petitioners have failed to prove such error or any other error in the determination except to the extent that respondent has already corrected such determination. Computation will be made under Rule 50 reflecting the corrections which respondent admits are required. 1949 Respondent determined that Barney *169 and Ida failed to report interest income of $103.50 for 1949. Petitioners have introduced no evidence on this point. Respondent's own exhibits containing the bank records of Accounts No. XX8139 and No. XXXX show that interest for 1949 totalled $143.16. The joint return reported $40. The correct amount of the understatement is $103.16. Respondent determined additional rental income of $217.05 by reducing a depreciation deduction. No evidence was introduced to refute this determination which must, therefore, stand. Respondent also determined that business expenses of the partnership were overstated by $2,958. Petitioners have proved no error in such determination which must, therefore, stand, subject to proper reflection of the interests of Barney and Harry in the partnership which respondent now concedes to be valid. 1950 Respondent determined that petitioners received unreported interest income of $75.86 and unreported dividend income of $262.26. Respondent also determined that the liquor business expenses were overstated by $742.96, and sales were understated by $6,000. Respondent further determined that Barney understated his long-term capital gain resulting from the sale *170 of Barney's liquor store and that a mathematical error of $1,350 resulting in an understatement of income occurred on the 1950 return. Petitioners have failed to establish error in these determinations except to the extent that respondent erred in failing to recognize the validity of the partnership between Barney and Harry (which he now concedes). Adjustments will be made accordingly. 1954 The joint return filed by Barney and Ida for 1954 listed a loss for the operation of Tubby's Liquor Store. Respondent determined that Tubby's had a net business profit of $6,180.76, all of which he attributed to Barney. On brief respondent concedes that the business was a partnership and that only two-thirds of the profit was Barney's. Respondent also determined that an auto expense item of $240.23 was not allowable. Respondent's determination of "Tubby's" profits is based on a stipulated regulation of the Commissioner for the State of Georgia requiring a minimum retail liquor markup. A clerk who worked in the store during 1944 to 1950 testified that "a good bit" of liquor was sold at a 10 per cent discount. No specific figures have been advanced by petitioners to show the extent, if any, *171 of such discounting. Nor has any evidence been introduced to warrant a conclusion that discounting occurred after 1950. Petitioners have failed to show that respondent erred in his determination. Cf. Ross Bowman, 17 T.C. 681 (1951). A failure of proof also exists as to the auto expense item insofar as it applies to Barney's share of the partnership. Respondent disallowed amortization of the purchase price of a leasehold interest purchased by the Star Liquor Store in which Barney was a partner, determining that the leasehold cost represented the acquisition of an intangible capital asset pertaining to a renewal right to obtain a liquor license. See Morris Nachman, 12 T.C. 1204 (1951) affd. 191 F. 2d 934 (C.A. 5, 1951), rehearing denied (C.A. 5, 1951). Petitioners have failed to meet the burden of proving error in respondent's determination disallowing the amortization item. Additions to Tax Understimation of Estimated Tax Respondent determined additions to tax for substantial underestimation of estimated tax under section 294(d)(2)[5] of the Code of 1939 for the years 1944 through 1950. The years 1944, 1945, and 1947 are barred by *172 limitations. See discussion supra. Petitioners have not contested this addition for the years 1946 and 1948. Respondent's determination is, therefore, sustained as to these years subject to adjustments to reflect concession of the partnership issue. The record supports the conclusion that the payments of estimated tax for 1949 and 1950 in each case equalled the tax stated to be due on the return for the prior year. There was no change during the periods here material in petitioners' status with respect to personal exemption and credit for dependents. We hold, therefore, that respondent's determination of additions to tax under section 294(d)(2) for 1949 and 1950 are in error. Herbert Schellenbarg, 31 T.C. 1269, 1279 (1959), (on appeal C.A. 6, 1959).
*173 Negligence - 1949, 1950 Respondent has imposed the 5 per cent negligence addition under section 293(a)[6] of the Code of 1939 for the years 1949 and 1950 because of failure to report several items of income. We have found that petitioners understated their 1949 interest income by $103.16. Petitioners did not contest the fact that they received $262.26 in dividends during 1950 which were not reported. Petitioners claim that the addition is not in order because the returns were prepared by a registered accountant. They offer no evidence, however, to the effect that they informed the accountant of the existence of these items. The ultimate responsibility for a correct return lies with the taxpayer, who must at least furnish the necessary information to his agent who prepared the return. See Elsie SoRelle, 22 T.C. 459, 489 (1954); Vern W. Bailey, 21 T.C. 678, 687 (1954). While the amounts in question are in themselves small, respondent's determination was within his administrative discretion, and petitioners have failed to demonstrate error. *174 Appropriate adjustment will be made under Rule 50 to reflect the conceded status of the partnership. Decisions will be entered under Rule 50. Footnotes
1. The following proceedings are consolidated herewith: Barney Finestone, Docket No. 50079, Barney Finestone and Ida Finestone, Docket No. 50080, Barney and Ida Finestone, Docket No. 52426; Barney Finestone and Ida Finestone, Docket No. 72197; Barney Finestone, Docket No. 72198.↩
2. After trial of this case, respondent conceded that a valid partnership existed between Barney and Harry Finestone, which fact will necessitate recomputation of the deficiencies stated above in the notices of deficiency. a1 Years involving joint returns of Barney and Ida Finestone are designated with an asterisk. Years without an asterisk concern the separate returns of Barney. a2 The figure "$12,309.98" was amended to read "$12,309.78" by an official order of the Tax Court, dated August 17, 1960 and signed by Judge Fisher↩.
3. The following explanatory symbols are used: n+ requiring adjustment discussed in Opinion; and a1 stipulated or agreed.↩
4. The following explanatory symbols are used: n+ requiring adjustments discussed in Opinion; n[*] per partnership books; and a1 stipulated or agreed.↩
*. Denotes joint return.↩
5. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. * * *
(d) Estimated Tax. - * * *
(2) Substantial underestimate of estimated tax. - If 80 per centum of the tax * * * in the case of individuals * * * exceeds the estimated tax * * * there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. This paragraph shall not apply to the taxable year in which falls the death of the taxpayer, nor, under regulations prescribed by the Commissioner with the approval of the Secretary, shall it apply to the taxable year in which the taxpayer makes a timely payment of estimated tax within or before each quarter * * * of such year * * * in an amount at least as great as though computed (under such regulations) on the basis of the taxpayer's status with respect to the personal exemption and credit for dependents on the date of the filing of the declaration for such taxable year * * * but otherwise on the basis of the facts shown on his return for the preceding taxable year. * * *↩
6. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. (a) Negligence. - If any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud, 5 per centum of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected, and paid in the same manner as if it were a deficiency, except that the provisions of section 272(i), relating to the prorating of a deficiency, and of section 292, relating to interest on deficiencies, shall not be applicable. * * *↩