HARRY L. SNYDER and M. WILROY SNYDER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Snyder v. Commissioner
Docket Nos. 3445-80, 21799-80, 21800-80, 2537-81, 2541-81, 2670-81, 2705-81.
United States Tax Court
T.C. Memo 1983-692; 1983 Tax Ct. Memo LEXIS 90; 47 T.C.M. (CCH) 355; T.C.M. (RIA) 83692; November 23, 1983. Louis B. Fine, for the petitioners. Scott Anderson and T. Keith Fogg, for the respondent. *94 FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: [2]Sec. 6653(a) Dkt. No.
Petitioner
Year
Deficiency
additions to tax
3445-80
Harry L. and M. Wilroy
1975
$26,914.66
$1,345.73
Snyder
1976
22,374.68
1,118.73
1977
50,663.66
2,533.18
21799-80
United States Sales
6/30/76
13,393.37
669.66
Corporation
6/30/77
21,721.44
1,086.07
6/30/78
5,491.62
274.58
21800-80
Defense Marketing
1975
3,546.03
177.30
Corporation
1976
3,257.39
162.86
1977
2537-81
Defense Marketing
1970
6,485.96
324.30
Corporation
1971
6,777.36
338.87
1972
12,742.43
637.12
1973
1,196.43
59.82
1974
4,480.13
224.00
2541-81
Harry L. Snyder
1971
29,648.27
1,482.41
1972
9,501.18
475.06
1973
8,954.39
447.72
1974
9,575.89
478.79
2670-81
Harry L. and
1970
22,913.04
1,145.65
Selma O. Snyder
2705-81
United States Sales
6/30/70
26,288.96
1,314.45
Corporation
6/30/71
56,243.25
2,812.16
6/30/72
121,562.56
6,078.13
6/30/73
9,326.29
446.31
6/30/74
9,934.12
496.71
6/39/75
11,085.07
554.25
*95 After concessions by petitioners and respondent, the following issues remain for our decision: (1) whether United States Sales Corporation (hereinafter US Sales) is entitled to certain net operating losses of L. Snyder's, Inc.; (2) whether US Sales and Harry L. Snyder are entitled to capital losses arising from transactions in L. Snyder's, Inc. shares; (3) whether certain payments made by US Sales to Selma Snyder were payments of personal expenses of Harry L. Snyder; (4) whether attorney's fees paid by Harry L. Snyder in connection with his divorce are deductible; (5) whether rental payments to Harry L. Snyder by US Sales were made as a condition to the continued use of property; (6) whether premiums paid by US Sales for insurance on Harry L. Snyder are excludable from his income; (7) whether premiums paid by US Sales for insurance on Harry L. Snyder are deductible by US Sales; (8) whether we have jurisdiction over a tax year as to which *96 respondent determined no deficiency; (9) whether certain automobile insurance premiums paid by US Sales are deductible; (10) whether automobile expenses attributable to the daughters of Harry L. Snyder are deductible by US Sales; (11) whether Harry L. Snyder must include in income as a constructive dividend amounts paid by US Sales for automobiles used by his daughters; (12) whether respondent erred in making certain adjustments to depreciation deductions claimed by US Sales; (13) whether respondent erred in disallowing certain investment tax credits claimed by US Sales; (14) whether certain expenses attributable to Louis Snyder are deductible by US Sales; (15) whether unreasonable salary paid to Louis Snyder by US Sales is a constructive dividend to Harry L. Snyder; (16) whether Gary Snyder received unreasonable compensation from Defense Marketing; (17) whether US Sales is entitled to deduct certain expenses paid for riding horses; (18) whether riding horse expenses paid by US Sales are constructive dividends to Harry L. Snyder; (19) whether payments made on Harry L. Snyder's behalf by US Sales are constructive dividends to him; (20) whether respondent erred *97 in disallowing Harry L. Snyder's deduction of certain losses of the Squires 4 Racing Stables joint venture; (21) whether respondent erred in adjusting the basis of a garage apartment owned by Harry L. Snyder; (22) whether certain site work is a capital expense; (23) whether office party expenses claimed by US Sales are allowable; (24) whether expenditures made by US Sales for an office party are constructive dividends to Harry L. Snyder; (25) whether US Sales is entitled to deductions claimed for fruits and flowers and hams and beverages; (26) whether expenditures by US Sales for fruits and flowers and hams and beverages are constructive dividends to Harry L. Snyder; (27) whether amounts paid by US Sales for a condominium are constructive dividends to Harry L. Snyder; (28) whether respondent erred in determining Harry L. Snyder's state of residence for purposes of calculating his allowable state sales tax deduction; (29) whether respondent must be sustained on various issues as to which petitioners have presented no evidence; (30) whether petitioners are liable for the section 6653(a) addition to tax. Because of the number of separate issues presented for decision, *98 our findings of fact and opinion for each issue are juxtaposed and for some issues are combined; we have, however, made general findings of certain facts relevant to more than one issue. GENERAL FINDINGS OF FACT Harry L. and M. Wilroy Snyder, husband and wife, resided in Miami, Florida, when their petition in this case was filed. Harry L. Snyder and Selma Snyder Rayfield resided in Virginia Beach, Virginia, when the petitions in docket Nos. 2670-81 and 2541-81 were filed. US Sales and Defense Marketing Corporation had their corporate offices in Virginia Beach, Virginia, when their petitions in this case were filed. Petitioner US Sales was incorporated in 1959. Petitioner Harry L. Snyder (hereinafter Harry) was the president of US Sales, and owned, either directly or constructively, for purposes of section 267(c), 100 percent of its stock during the years before us. Throughout the years before us, US Sales engaged in the business of brokering merchandise to military exchanges. Nautical Boat Works, a division of US Sales, was established on February 26, 1968. It manufactured small fiberglass boats, beginning sometime during the year following its creation as a division. *99 Petitioner Defense Marketing Corporation (hereinafter Defense Marketing) was incorporated in 1965. Harry was president of Defense Marketing in 1970 and 1971, and its chairman of the board from 1972 through 1976. Defense Marketing was in the business of brokering merchandise to military exchanges.
Issue 1
FINDINGS OF FACT L. Snyder's, a department store in Norfolk, Virginia, was founded in 1894 by Louis Snyder, Harry's grandfather. L. Snyder's was incorporated in 1959, at which time its stock was split evenly between the families of Sol Snyder and Ben Paul Snyder, the sons of Louis Snyder. On October 9, 1965, Harry and his brother Edward B. Snyder contracted to manage L. Snyder's department store. They directed L. Snyder's operations until January 31, 1969, when L. Snyder's ceased operations. L. Snyder's then sold its fixtures and factored its accounts receivable, and the building in which L. Snyder's had been located was torn down and replaced with a parking lot. [3]
Harry acquired 170 shares of L. Snyder's stock in 1959 and 60 shares on December 15, 1965. US Sales *100 began to acquire L. Snyder's stock on May 20, 1966, when it purchased 250 shares on July 21, 1966, and 250 shares on December 20, 1967. On December 20, 1967, L. Snyder's had outstanding 4,263 shares of stock, of which 230 were held by Harry and 750 by US Sales. Ownership of L. Snyder's stock remained unchanged from December 20, 1967 to at least January 31, 1969. On April 15, 1969, 4,243 shares of L. Snyder's stock were outstanding, of which 230 were held by Harry and 1,217 by US Sales. On December 15, 1970, 2,126 shares were outstanding, of which 125 were held by Harry and 834 by US Sales. On December 15, 1970, the shareholders of L. Snyder's agreed to merge L. Snyder's into US Sales. By that time, most of L. Snyder's assets had been distributed to its shareholders, and $37,741.14 in cash remained in corporate solution. US Sales issued stock to the L. Snyder's shareholders in exchange for their shares of L. Snyder's stock. US Sales later redeemed these US Sales shares. In redeeming the US Sales shares issued to former shareholders of L. Snyder's, US Sales paid each shareholder his or her pro rata share of the cash held by L. Snyder's at the date of the exchange of shares. *101 On January 15, 1971, Harry's C.P.A. sent him a letter concerning the merger of L. Snyder's and US Sales, which contained the following language: This has been a most difficult merger because of two complicated factors which is the protection of the large operating loss carryover and the large disparity between the values of the Snyder stock and the United States Sales stock. For your information the operating loss carryover available to you is as follows: 1967
$ 9,261.81
(Profit)
1968
25,765.87
(Loss)
1969
145,204.00
(Loss)
1970
1,581.79
(Profit)
$160,126.27
(Loss)
On April 8, 1971, articles of merger were filed with the Virginia State Corporation Commissioner and L. Snyder's was merged into US Sales. Following the merger, US Sales did not engage in the department store business formerly carried on by L. Snyder's. Beginning in 1965, Harry took charge of L. Snyder's bookkeeping and accounting. Harry gradually transferred L. Snyder's bookkeeping and accounting department to US Sales' accounting department. In April 1968, plans were completed for a building to house US Sales, Defense Marketing, and the accounting department of L. Snyder's. *102 This planned building was never built because bids received to build it were too high. While it was a going concern, L. Snyder's sold small boats of the kind manufactured by the Nautical Boat Works division of US Sales. In the years following the merger of L. Snyder's into US Sales, Nautical Boat Works did not use the L. Snyder's name in its advertisements or exhibitions. In November 1973, employees of US Sales wrote to a number of firms whose products had been carried by L. Snyder's, seeking to acquire for US Sales the right to represent those firms in the military market. [4]
*103 OPINION Section 269 provides in pertinent part: (a) In General.--If-- (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, * * * * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. Petitioner US Sales contends that a business purpose was the principal purpose behind its acquisition of L. Snyder's, while respondent contends that tax avoidance was the principal purpose of the acquisition. In order for section 269(a) to be applicable, tax avoidance must be the principal purpose for the acquisition. S. Rept. No. 627, 78th Cong., 1st Sess. (1943), 1944 C.B. 1017; *104 Commodores Point Terminal Corp. v. Commissioner,11 T.C. 411, 416 (1948). To prevail, petitioner US Sales need prove only that the avoidance of tax was not its principal purpose in acquiring L. Snyder's. Bush Hog Manufacturing Co. v. Commissioner,42 T.C. 713, 729 (1964). However, petitioner US Sales must prove the Commissioner's determination to be wrong by a preponderance of the evidence. American Pipe & Steel Corp. v. Commissioner,243 F.2d 125 (9th Cir. 1957), affg. 25 T.C. 351 (1955); Capri, Inc. v. Commissioner,65 T.C. 162, 178 (1975). The issue is factual and our inquiry must be focused upon all the circumstances surrounding US Sales' acquisition of control of L. Snyder's. Sec. 1.269-3(a), Income Tax Regs.; D'Arcy-MacManus & Masius, Inc. v. Commissioner,63 T.C. 440, 449 (1975). Harry acquired 170 shares of L. Snyder's stock at the time of its incorporation in 1959, and another 70 shares in 1965. US Sales acquired 250 shares of L. Snyder's stock on May 20, 1966, 250 shares on July 21, 1966, and 250 shares on December 20, 1967. As of December 20, 1967, Harry and US Sales *105 together owned 980 of L. Snyder's 4,263 outstanding shares, or 23 percent of L. Snyder's stock. Since the losses (the carryover of which respondent wishes to deny) did not occur until L. Snyder's 1968 and 1969 tax years, we are satisfied that tax avoidance was not the principal purpose of the acquisition of these 980 shares of L. Snyder's stock. In Swiss Colony, Inc. v. Commissioner,52 T.C. 25 (1969), affd. 428 F.2d 49 (7th Cir. 1970), we were faced with a corporation that created a wholly owned subsidiary, allowed its percentage interest to fall to 30 percent, and then reacquired sufficient stock to give it 50 percent control for purposes of section 269. There can be no doubt from the facts of that case that the subsidiary was originally formed for business purposes, and that when the corporate taxpayer owned only 30 percent of its subsidiary's stock, that stock had not been acquired for the principal purpose of tax avoidance. Nevertheless, we held that for determining whether the taxpayer had a principal purpose of tax avoidance under the intendment of section 269 it was necessary to look to the taxpayer's purposes for acquiring the stock that *106 gave it 50 percent control of its subsidiary. In the case before us, then, we must look to the purpose underlying the acquisition of shares by which US Sales gained control of L. Snyder's for purposes of section 269. L. Snyder's department store went out of business on January 31, 1969, and never reopened. By December 15, 1970, L. Snyder's assets totaled $37,741.14 in cash. Sometime after January 31, 1969, US Sales acquired additional shares of L. Snyder's stock, and certain other shares of the corporation were redeemed, so that by December 15, 1970, Harry and US Sales together held 959 of L. Snyder's 2,126 outstanding shares, or 45 percent.
On December 15, 1970, US Sales exchanged some of its shares for the shares of L. Snyder's, became 100-percent owner of L. Snyder's, and thereby acquired control of L. Snyder's for purposes of section 269. [5] If the L. Snyder's shares acquired by US Sales on December 15, 1970 were acquired for the principal purpose of tax avoidance, US Sales may not carry over the 1968 and 1969 losses of L. Synder's. Sec. 269. *107 US Sales contends its acquisition of control of L. Snyder's was principally motivated by two business purposes: L. Snyder's operated prior to January 31, 1969, a large boat showroom, and US Sales wished to acquire the goodwill built up by L. Snyder's boat sales department to aid in merchandising boats produced by the Nautical Boat Works division of US Sales. Also, L, Snyder's had contacts with many manufacturers not represented by US Sales, and by acquiring L. Snyder's, US Sales hoped to enhance its chances of being chosen to represent these various manufacturers. We are unable to attribute much importance to either of the business purposes alleged by US Sales. US Sales supposedly acquired L. Snyder's because the goodwill developed by L. Snyder's boat department would help its Nautical Boat Works division to merchandise boats, yet in the years following the acquisition of L. Snyder's, Nautical Boat Works' boat advertisements failed to mention L. Snyder's at all. US Sales also contends that it acquired L. Snyder's with the hope that various manufacturers whose goods had been sold by L. Snyder's would grant to US Sales the right to sell their merchandise. To support this claim, *108 US Sales offered the testimony of George Masters, executive vice president of US Sales, that he found the L. Snyder's name useful in obtaining at least 75 lines of merchandise for US Sales to represent. The only substantiation offered in support of this testimony was a number of letters to manufacturers written under the L. Snyder's heading on November 12, 1973. Nothing in the body of these letters stresses goodwill associated with L. Snyder's; rather, the chief selling point is US Sales' experience in selling to the military. [6] There is no direct evidence in the record that US Sales used the L. Snyder's name prior to 1973 in its efforts to acquire new lines to represent. This suggests that using the L. Snyder's name was more of an afterthought than a principal purpose of the US Sales acquisition of L. Snyder's. *109 When US Sales acquired control of L. Snyder's, L. Snyder's was a corporate shell with no assets but cash and a large net operating loss. US. Sales made no attempt to revitalize the department store previously operated by L. Snyder's, and failed to present evidence of any significant business purpose for its acquisition. The record does establish, however, that US Sales' president was conscious of L. Snyder's net operating loss, and hoped to use that loss to reduce US Sales' tax liability. [7] Based on the foregoing factors, and the entire record, we find and hold that petitioner US Sales has not carried its burden of proving that tax avoidance was not the principal purpose for its acquisition of control of L. Snyder's. See F.C. Publication Liquidating Corp. v. Commissioner,36 T.C 836 (1961), affd. 304 F.2d 779 (2d Cir. 1962). Issue 2
FINDINGS OF FACT AND OPINION Harry and US Sales each *110 claimed a deduction based on losses relative to their L. Snyder's stock. Harry claimed a loss on the sale of L. Snyder's stock on his 1970 return in the amount of $10,318.85. Respondent disallowed this loss. The loss claimed by Harry is attributable to his sale to US Sales of L. Snyder's stock. At the time of the sale, Harry was the 100-percent owner of US Sales. Section 267(a)(1) provides that "[n]o deduction shall be allowed * * * [i]n respect of losses from sales or exchanges of property (other than losses in cases of distributions in corporate liquidations), directly or indirectly, between persons specified within any one of the paragraphs of subsection (b)." Section 267(b)(2) provides that the "persons referred to in subsection (a) are: * * * An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual." The language of section 267(b)(2) applies squarely to Harry, and any loss attributable to the sale to US Sales of Harry's L. Snyder's stock will therefore be disallowed. Sec. 267(a)(1). US Sales claimed a loss of $29,417.25 on its fiscal 1971 return as to its stock of *111 L. Snyder's. This loss is attributable to its acquisition of L. Snyder's. Respondent disallowed this loss. We know of no theory allowing a taxpayer to recognize a loss upon the acquisition of stock with respect to which the loss is claimed. There is no evidence in this record that US Sales sold or exchanged its L. Snyder's stock in 1971; the loss in issue will therefore be disallowed. Issue 3
FINDINGS OF FACT Harry and his then wife, Selma Snyder, were separated in February 1970. Prior to the separation, Selma worked as an office manager for US Sales. Selma did not work for US Sales following the separation, but she continued to receive payments from US Sales in the amount of her previous salary payments. Harry and Selma were divorced on April 1, 1971. The decree of divorce incorporated an agreement of February 4, 1971, that provided, in pertinent part: Now, therefore, the parties agree as follows, without in any way attempting to facilitate divorce or separation, but rather in recognition of the prior and existing separation of the parties, and in order to finally determine and fix their property rights and to contract for the amount to be paid wife in lieu *112 of alimony and to set forth their agreement concerning the custody, care and maintenance of the parties: 1. Husband shall pay to wife hereafter on the 1st day of each month beginning March 1st, 1971, the sum of $800.00 in lieu of alimony, same to terminate on the death of either husband or wife, or upon wife's remarriage. This sum shall not be subject to revision by way of increase or decrease except in the event of any of the aforesaid contingencies. It is agreed that said sum may be paid by United States Sales Corporation to wife as salary so long as said corporation finds same to be practical in its judgment, and at such time as same is not paid to wife by said corporation, said sum shall be paid by husband personally. In either event, same shall be accepted by wife in lieu of alimony and shall be subject to all of the foregoing contingencies. Nothing contained herein, however, shall be construed as relieving husband from the personal obligation to insure that said payments are made, again, subject to the foregoing contingencies of death and remarriage. US Sales paid Selma $800 per month pursuant to the foregoing agreement until Selma remarried in 1975. Selma was president *113 and sole owner of United States Sales International (hereinafter International) from 1969 through 1978, at which time International was acquired by US Sales. International served as a merchandiser's representative to overseas United States military exchanges. The manufacturers represented by US Sales and International generally required that they be represented in both domestic and overseas markets. US Sales and International were thus dependent on each other to provide satisfactory representation to the manufacturers they represented. OPINION A payment by a corporation in satisfaction of a personal obligation of its sole shareholder is a dividend to that shareholder. Nicholls, North, Buse Co. v. Commissioner,56 T.C. 1225, 1238 (1971); Challenge Mfg. Co. v. Commissioner,37 T.C. 650, 663 (1962). Although Selma Snyder stopped working for US Sales in February 1970, when she and Harry Snyder were separated, US Sales continued to pay Selma $800 a month until her remarriage in 1975. Respondent contends, and petitioner denies, that these payments satisfied personal obligations of Harry, and are therefore dividends to him which may not be deducted *114 by US Sales. [8]
Petitioner has the burden of proving that the payments in question were not made to satisfy a personal obligation of Harry. Rule 142(a). The separation agreement under which most of the payments in issue were made explicitly provides that Harry has "the personal obligation to ensure that said payments are made." US Sales offered no evidence in derogation of Harry and Selma's divorce agreement, but relies on two arguments in support of its position.First, US Sales argues that the payments it made on Harry's behalf were not alimony payments, but payments in lieu of alimony.The distinction petitioner wishes to draw is irrelevant, since the issue before us is not the nature of Harry's personal obligation to Selma, but whether US Sales' payments to Selma satisfied a personal obligation, of whatever description, of Harry's. Petitioner also argues that its payments to Selma were payments for services rendered by Selma.According to Harry, Selma's corporation, International, performed a valuable service for US Sales *115 by representing clients of US Sales in the overseas market. We find this argument unpersuasive. Harry's testimony indicated that US Sales and International had a symbiotic relationship, in that each depended on the other--International depended on US Sales to cover the domestic market to the same extent that US Sales depended on International to cover the overseas market. In this situation it is hard to see why US Sales should have felt any need to pay Selma for operating International. US Sales stopped all payments to Selma on the date of her remarriage, although Selma continued to operate International until 1978, when International was acquired by US Sales. US Sales has offered no explanation why it stopped making payments to Selma upon her remarriage even though she continued to provide the "service" of operating International. We are convinced that US Sales stopped making payments to Selma simply because Harry's obligation to Selma terminated upon her remarriage.We find and hold that US Sales has failed to meet its burden of proving that its payments to Selma were not payments made in satisfaction of a personal obligation of Harry's. [9] Respondent's determination on this *116 issue will therefore be upheld. Issue 4
FINDINGS OF FACT AND OPINION Harry deducted attorney's fees of $1,596.50 paid in connection with his divorce. Of this amount, respondent allowed $100 as a deduction. Harry alleged in his petition that the attorney who handled Harry's divorce had stated in a letter that 70 percent of his time on that matter pertained to tax advice. On brief, Harry submitted a copy of the letter from his attorney. Unfortunately for Harry, the letter in question was not introduced into evidence in this case and the letter's author was not called to testify. Rule 143(b). The statement in Harry's petition concerning *117 the letter from his attorney is also not in evidence, Rule 143(b), and in any event is hearsay under rule 801(a) and (c) of the Federal Rules of Evidence. The burden of proof on this issue is upon Harry. Rule 142(a). We conclude that he has not carried his burden of proof, and respondent's determination will therefore be upheld. [10]
Issue 5
FINDINGS OF FACT Harry purchased on January 10, 1969, two parcels of land, totaling 4.865 acres, for $40,000. Harry caused to be constructed on this property (hereinafter the Barrett Street property) a combination warehouse and office building at a cost of $258,000. By leases dated January 1, 1970, Harry leased the Barrett Street property to US Sales and Defense Marketing. The term of both leases was from January 1, 1970 to December 31, 1974. Both leases were net leases under which the tenants were to bear all expenses related to the Barrett Street property, including all taxes. *118 Rent was fixed at $3,000 per month under the US Sales lease and $7,200 per year under the Defense Marketing lease. The lease between Harry and US Sales was signed by Harry in his individual capacity, but no representative of US Sales signed this lease. A regular meeting of the board of directors of US Sales was held February 15, 1970. The minutes of this meeting, signed by Harry, as president of US Sales, contain the following language: United States Sales Corporation plans to move into the Industrial Park, Exit 5, Virginia Beach, Virginia on March 1, 1970. It has been agreed between Mr. Harry L. Snyder and United States Sales Corporation that they will be renting the building at 2644 Barrett Street, Virginia Beach, Virginia, and will pay all maintenance, taxes, utilities, and insurance on the building. The lease will be in the amount of $3,000 per month, payable to Mr. Harry L. Snyder, owner. Saul & Alexander M. Salzberg & Company, Alexander Salzberg, appraiser, valued the land at 4.9 acres at $15,000 per acre, valuing the land at $73,500. The value of the building and improvements was $307,215.00. The total project value is $380,715.00. A lease dated June 1, 1970, effective *119 June 1, 1970 through December 31, 1974, provided for an increase in rent from $3,000 to $4,000 per month. US Sales payed rent of $3,000 per month until May 1971, at which time an adjusting journal entry was made on US Sales' books crediting Harry's drawing account in the amount of $12,000. The aforementioned lease of June 1, 1970, contains an addendum providing "[e]ffective July 1, 1972 the rent will be increased to $5,000.00 per month due to increased evaluation of property and building." Upon the termination of the lease on December 31, 1974, US Sales and Defense Marketing continued to lease the Barrett Street property from Harry at the same rents they had been paying. On May 28, 1974, US Sales subleased part of the Barrett Street property to American Hospital Supply Corporation for one year, with two one-year renewal options. The sublease provided for rental of $40,713 per year.It further provided that all taxes and assessments were to be paid by US Sales, and that US Sales was to provide fire and extended coverage insurance for the rented premises. American Hospital Supply rented approximately 18,155 square feet of warehouse space (out of 20,597 total) at $2 per square *120 foot per year, and approximately 870 square feet of office space (out of 4,274 total) at $6.50 per square foot per year. [11]
When US Sales moved into the Barrett Street building, its Nautical Boat Works division manufactured fiberglass boats in the building, and used significant portions of the land surrounding the building for boat storage. Sometime prior to May 1974, Nautical Boat Works terminated its boat building activities. The Barrett Street property was designed as a boat factory. It contained a high ceiling to provide room for boat construction, and a 6,000 gallon resin tank was built into one wall of the building. Once the Nautical Boat Works building operation ceased, the Barrett Street property was not well suited to the remaining business of US Sales. On June 10, 1977, US Sales subleased to Solar One, Ltd., 5,260 square feet of warehouse space at $1.60 per square foot per year and 900 square feet of office space at $6 per square foot per year, a total rent of $1,150 per month. The sublease further provided: "It is agreed that Solar One Ltd. is *121 renting above area on a month to month lease, at Solar One [sic] request with either party giving the other sixty [60] days notice to terminate lease, with, or without cause." The sublease did not call for Solar One, Ltd., to bear any property taxes assessed on the Barrett Street property.
OPINION Section 162(a) provides that a taxpayer may deduct all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business, including: (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. Section 162(a)(3) does not specifically limit deductions for rental payments to a reasonable allowance, but we have held that "[w]hen there is a close relationship between the lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger. *122 " Place v. Commissioner,17 T.C. 199, 203 (1951), affd. 199 F.2d 373 (6th Cir. 1952), cert. denied 344 U.S. 927 (1953); Limericks, Inc. v. Commissioner,7 T.C. 1129 (1946), affd. 165 F.2d 483 (5th Cir. 1948); Potter Electric Signal & Mfg. Co. v. Commissioner,286 F.2d 200 (8th Cir. 1961), affg. a Memorandum Opinion of this Court; Jack's Cookie Co. v. United States,597 F.2d 395, 399-400 (4th Cir. 1979), cert. denied 444 U.S. 899 (1979). US Sales contends, and respondent denies, that its rental payments to Harry were not in excess of what it would have paid an arm's-length lessor and were made as a condition to the continued use of the Barrett Street property. The burden of proof on this issue falls upon US Sales. Rule 142(a). On January 1, 1970, Harry and US Sales entered into a five-year lease calling for monthly rental payments of $3,000. A new lease, dated and effective June 1, 1970, raised the monthly rent to $4,000, and an addendum to this lease, effective July 1, 1972, raised the monthly rent to $5,000. US Sales does not contend that it received any *123 consideration from Harry for increasing the rent it paid him. In Stanwicks, Inc. v. Commissioner,15 T.C. 556 (1950), affd. per curiam 190 F.2d 84 (4th Cir. 1951); Consolidated Apparel Co. v. Commissioner,17 T.C. 1570, (1952), revd. in part and affd. in part 207 F.2d 580 (7th Cir. 1953); and Ray's Clothes, Inc. v. Commissioner,22 T.C. 1332, 1340 (1954), [12] we held that where a corporation holding a leasehold interest under a lease with a related party accepts, without consideration, a new and less advantageous lease, it may not deduct as rent the excess of payments required under the new lease over payments required under the old, because such amounts are not required as a condition to the continued use of property. [13]
*124 As far as we can tell from this record, and the burden is on petitioner to prove otherwise, the original lease of January 1, 1970, was binding on both parties. Harry signed the lease in his individual capacity, and signed in his capacity as president of US Sales minutes of a directors' meeting which set out in detail and approved the terms of the January 1, 1970 lease. Both parties to the lease thus satisfied the Virginia statute of frauds, Va. Code, secs. 11-1 and 11-2 (1950); Fanney v. Virginia Investment and Mortgage Corp.,200 Va. 642, 107 S.E. 2d 414 (1959); Newport News, H. & O.P. Development Co. v. Newport News St. Ry. Co.,97 Va. 19, 32 S.E. 789 (1899). US Sales argues that the January 1, 1970 lease was a "memorandum lease" and never meant to be permanent. According to Harry, a permanent lease was to be consummated only when an appraiser's report was submitted by Alexander Salzberg. We find this argument unpersuasive. If Harry and US Sales meant the January 1, 1970 lease to be temporary, we doubt that they would have specified a term of five years.Additionally, we note that the minutes of the US Sales board of *125 directors' meeting of February 15, 1970, refer specifically to the appraiser's report of Alexander Salzberg, [14] which undercuts Harry's assertion that the parties agreed to change the January 1, 1970 lease upon receiving the appraiser's report. Based on the foregoing, and the entire record, we conclude that the January 1, 1970 five-year lease between US Sales and Harry was a valid lease, binding upon both parties. Petitioners have presented no evidence of any consideration received by US Sales in exchange for accepting a less favorable lease. We therefore find and hold that all rental payments for the Barrett Street property during the term of the January 1, 1970 lease in excess of the $3,000 per month psecified in that lease were not paid as a condition to the continued possession of property, and are therefore not deductible by US Sales. Stanwicks, Inc.,supra;Consolidated Apparel Co.,supra., *126 Ray's Clothes, Inc.,supra.[15]
It remains for us to determine the market rental value of the Barrett Street property during the period subsequent to the termination of the January 1, 1970 lease. US Sales continued to pay Harry $5,000 per month rent on the Barrett Street property after December 31, 1974, although evidently the previous lease was not renewed and no new lease was signed. Defense Marketing continued to pay rent of $7,200 per year following the termination on December 31, 1974, of its lease with Harry, again apparently without entering into a new lease. Harry thus received annual rent on the Barrett Street property of $67,200 during the years in issue falling after December 31, 1974. The parties rely on the testimony and reports of their respective expert witnesses *127 to establish the market rental value of the Barrett Street property during the years in issue. Both expert witnesses calculated the fair rental value of the Barrett Street property under a lease with terms similar to those of US Sales' sublease with American Hospital Supply, namely, a three-year lease with the lessor paying for taxes, structural repairs and fire insurance. Assuming such a lease, petitioners' expert estimated market rental value under a lease running from 1975 through 1977 to be $82,605 per year. Using similar assumptions, respondent's expert estimated market rental to be $69,000 per year. Respondent's expert used two methods to arrive at his estimate. Under his fair rental value by market approach, he multiplied the amounts per square foot specified in the American Hospital Supply sublease by the total square footage of the Barrett Street property. Under his fair rental value by income approach, respondent's expert assumed a market return of 11.5 percent for real estate investments at the time the Barrett Street property was constructed. He applied this rate to Harry's cost of building plus the fair market value of the land at the time of construction, and *128 then added $10,000 per year to cover expenses, giving a 1970-1971 rental value of $47,000, or approximately $68,000 a year for 1975-1977, allowing eight percent for inflation. Petitioners' expert relied primarily on the American Hospital Supply sublease.He estimated the market rental of the Barrett Street building at $68,000 per year for 1974. His estimate differs from that of respondent's expert in that he added an additional $7,110 per year for part of the land on which the Barrett Street building was situated, and $7,510 for inflation from 1975 to 1977. We believe respondent's expert is more worthy of credence than petitioners' expert. In his fair rental value by income approach, respondent's expert included the full value of the Barrett Street land in calculating the rental value of the Barrett Street property. On cross-examination by respondent, petitioners' expert testified that a reasonable capitalization figure to use in calculating the 1970 market rental would be 12 percent for improvements and 8 to 10 percent for land. Applying these figures gives a market rental for 1970 very close to that of respondent's expert.[16]
*129 American Hospital Supply used the land surrounding the Barrett Street building for parking and for access to the building. The record does not suggest that US Sales used the land surrounding the building for any additional purpose during the year 1975 and after. Based on the foregoing considerations, and the entire record, we conclude that petitioners' expert erred in concluding that the American Hospital sublease valued only the Barrett Street building and not the surrounding land. We further conclude that since the American Hospital lease ran from May 28, 1974 to May 28, 1975, with options for two one-year renewals, no increase for inflation is appropriate in calculating the 1975 rental value under a three-year lease of the Barrett Street property. We therefore find that the rental value of the Barrett Street property under a three-year lease calling for taxes, structural repairs and fire insurance to be paid by the lessor was $69,000 per year. US Sales' rental arrangement with Harry differed from its sublease to American Hospital in that US Sales paid all expenses of maintaining the building, including taxes and insurance. Respondent's expert estimated such expenses *130 at $10,000 per year for 1970, and estimated an eight percent per year increase thereafter. Petitioner, upon whom rests the burden of proof, Rule 142, failed to introduce any evidence on this point. We therefore find that the expenses paid by US Sales and Defense Marketing under their rental arrangements with Harry were $10,000 increased by eight percent per year for each year after 1970, or $14,693 in 1975. We find that the fair rental for 1975 was $69,000 minus the expenses we have found US Sales and Defense Marketing paid that year, $14,693, or $54,307. As noted above, Defense Marketing paid Harry $7,200 rent during the years in issue. Under the peculiar circumstances of this case, we find and hold that the rent deductible by US Sales under section 162(a)(3) for the calendar year 1975 (which does not coincide with US Sales' taxable year) is the fair rental value of the entire Barrett Street property under a net lease, $54,307, less the $7,200 paid by Defense Marketing, $47,107, or $3,925.58 per month. Since the rental arrangements between Harry and US Sales and Harry and Defense Marketing were evidently month-to-month tenancies during 1975 and thereafter, we further find *131 that the 1975 fair rental value of the Barrett Street property must be increased by eight percent per year to derive the fair rental values for subsequent years. For such years, the amount deductible by US Sales under section 162(a)(3) is the fair rental value of the entire Barrett Street property under a net lease, less $7,200. [17]
Issue 6
FINDINGS OF FACT AND OPINION US Sales made payments for insurance and medical examinations for Harry in the amounts of $649.97, $1,671.12, and $1,765.15 in its taxable years ended in 1970, 1971 and 1972, respectively. These payments were made pursuant to an arrangement adopted July 1, 1969 by US Sales' board of directors, calling for US Sales to "pay all group hospitalization, group life insurance, and annual medical examination doctors fees for Harry L. Snyder, President, U.S. Sales Corp." [18] Harry contends that these payments are excludable from his income under section 105; respondent asserts the contrary, and further asserts that such *132 payments as were made under the aforementioned arrangement for group life insurance are likewise not excludable from Harry's income under section 79. Section 105 provides generally that amounts received under accident and health plans are excludable from gross income. [19]Section 1.105-5(a), Income Tax Regs., provides definitive guidelines as to what constitutes an accident or health plan. A plan may cover one or more employees and different plans may be established for different employees or classes of employees. An employee's rights need not be enforceable but, if so, he must be covered by a plan and notice or knowledge of such plan must be communicated to him as a definite policy though the plan need not be in writing. Sec. 1.105-5, Income Tax Regs.; Lang v. Commissioner,41 T.C. 352 (1963). In addition, the plan must exist for the benefit of employees, as opposed to shareholders. Larkin v. Commissioner,48 T.C. 629 (1967), affd. 394 F.2d 494 (1st Cir. 1968). *133 Assuming without deciding that the amounts in issue were paid pursuant to a plan within the intendment of section 105, we turn to the narrow factual question whether the plan was "for employees." As we stated in Levine v. Commissioner,50 T.C. 422, 427 (1968); [T]here must be some rational basis other than ownership of the business to justify discrimination among employees; i.e., that the so-called sick pay in question must in fact represent bona fide sick pay for employees rather than distributions to stockholders. * * * [See also American Foundry v. Commissioner,536 F.2d 289, 294 (9th Cir. 1976), affg. in part and revg. in part 59 T.C. 231 (1972).] Since we have considered the question now before us in a number of previous cases, each party was able to cite us to cases reaching its preferred result. [20] After carefully considering the record before us in light of these cases, we believe that respondent has the better of the argument. *134 To meet the requirements set out in Levine,supra, Harry must establish that there was some rational basis, other than his stock holdings, for US Sales to discriminate in favor of him. Petitioners have introduced no evidence tending to show that the services performed by Harry for US Sales differed significantly from those performed by other executives of US Sales, such as Donald Wizeman and George Masters. [21] Petitioners have also not shown that any employee of US Sales other than Harry was provided with hospitalization insurance or otherwise covered by a health care plan by US Sales.[22] These factors suggest that US Sales discriminated in favor of Harry because of his stock holdings. In further support of this conclusion, we note that Harry, as the sole shareholder of US Sales during the years here in issue, received a benefit from US Sales' payment of hospitalization premiums proportional to his stock interest, i.e., Harry, the 100 percent shareholder, received 100 percent of the benefit. [23] Based on these factors, and the entire record, we find and hold that the plan was intended to benefit Harry as the owner of US Sales and therefore that the plan did *135 not qualify under section 105. *136 The plan also called for the payment of group life insurance premiums for Harry. Under certain circumstances the cost of group-term life insurance on an employee's life carried by his employer shall not be included in the employee's income. Sec. 79. Section 1.79-1(b)(1), Income Tax Regs., as applicable during the years in issue defines group-term life insurance as term life insurance protection. Since petitioners, who bear the burden of proof, Rule 142(a), have introduced no evidence establishing that Harry's life insurance was group-term life insurance as defined in section 1.79-1(b)(1), Income Tax Regs., see Whitcomb v. Commissioner, 81 T.C.     (filed Sept. 21, 1983), [24] we must conclude that any life insurance premiums paid by US Sales under the plan do not qualify under section 79. We hold that the amounts in issue are includable in Harry's income, as determined by respondent. Issue 7
FINDINGS OF FACT AND OPINION US Sales contends *137 that it is entitled to deduct the amounts discussed in the preceding section.We have held that such payments are not excludable from Harry's income under either section 105 or section 79; it follows that they do not qualify as ordinary and necessary business expenses under section 162 and section 1.162-10(a), Income Tax Regs.Larkin v. Commissioner,48 T.C. 629, 635 (1967), affd. 394 F.2d 494 (1st Cir. 1968). [25] Respondent's determination will therefore be upheld. Issue 8
FINDINGS OF FACT AND OPINION Defense Marketing contends that we have jurisdiction over its 1977 taxable year. In the notice of deficiency for Defense Marketing's 1975, 1976 and 1977 taxable years, respondent determined that there was no deficiency for Defense Marketing's 1977 *138 taxable year, and now contends that we lack jurisdiction with respect to that taxable year. We agree with respondent. This Court has jurisdiction only over taxable years with respect to which respondent had determined that a deficiency exists. Sec. 6214(b). See Parker v. Commissioner,37 T.C. 331, 332 (1961); Paccon v. Commissioner,45 T.C. 392, 396-397 (1966). ISSUE 9
FINDINGS OF FACT AND OPINION Respondent made the following determination in his deficiency notice in docket No. 2705-81: (cc) Insurance - Automobiles:
The expense for automobile insurance is decreased to account for the personal portion allocable to Mr. Harry L. Snyder, his father, Mr. Ben Paul Snyder and his children. 6/30/70
6/30/71
6/30/72
Personal
Personal
Personal
Insurance
Use
Insurance
Use
Insurance
Use
Harry L. Snyder
(25% 6/70/71,
30% 6/72)
$235.00
$58.75
$307.50
$76.88
$380.00
$114.00
Ben Paul
Snyder - 95%
220.00
209.00
283.50
269.33
347.00
329.65
Louis P.
Snyder - 90%
195.00
175.50
271.00
243.90
347.00
312.30
Teresa &
Patricia Snyder
(6/71-100%
for 6 mos.
6/72-90%)
228.00
114.00
228.00
205.20
Gary Lee Snyder
(6/70-90%,
6/71-90%-7
mos.)
195.00
175.50
271.00
142.27
Total
Disallowed
$618.75
$846.38
$961.15
*139 The parties have stipulated that in docket No. 2705-81, "with respect to the automobiles used by Harry Snyder, the applicable percentage of personal use is 10 percent for fiscal years ending June 30, 1970 through June 30, 1978." Although adjustment cc, reproduced above, is not mentioned by the parties in their stipulation, respondent concedes that the portion of personal use by Harry of US Sales automobiles was 10 percent in US Sales' fiscal years ending in 1970, 1971 and 1972. US Sales contends that the aforementioned stipulation settles all of the disallowances set forth by respondent in adjustment cc. This contention is without merit. The burden of proof is upon taxpayers on this issue. Rule 142(a). Since US Sales has made no other argument concerning the disputed amounts, respondent's determination will be upheld, except where respondent has conceded otherwise.[26]
*140 Issue 10
FINDINGS OF FACT AND OPINION Respondent disallowed US Sales' deduction of various carrelated expenses incurred by Patti and Terri Synder, Harry's daughters, and paid by US Sales in its fiscal years ended in 1970, 1971 and 1972. US Sales asserts that the deductions in issue are allowable as ordinary and necessary business expenses. US Sales bears the burden of proof on this issue. Rule 142(a).Patti Snyder testified that she and Terri Snyder shared a company car which they used solely for business purposes such as going to the post office and the bank, and running various errands. She further testified that the car she shared with Terri Snyder was the sole office car and was generally used by US Sales employees to run errands. After considering the entire record, we are not persuaded that US Sales has carried its burden of proof on this issue. Its tax returns for the years in issue indicate that US Sales owned a substantial number of automobiles. We assume that US Sales kept records of the uses to which these automobiles were put. US Sales introduced no such records in evidence, and did not explain its failure to do so. We conclude from this that had such *141 records been introduced, they would not have supported US Sales' position that the only company car used by Patti and Terri Snyder was the office car. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Based on the foregoing, and the entire record, we conclude that the possibly self-serving testimony of Patti Snyder does not suffice to carry US Sales' burden of proof as to the expenses in issue, and respondent's determination on this issue will therefore be upheld. Rule 142(a). Issue 11
FINDINGS OF FACT AND OPINION Respondent has determined that Harry must include in income as a constructive dividend the amount of automobile expenses incurred by Patti and Terri Snyder that were reimbursed by US Sales, and the value of automobiles used by Patti and Terri Snyder. Harry, upon whom rests the burden of proof, Rule 142(a), contends that respondent's determination is in error solely on the ground that his daughters used US Sales' automobiles only for business purposes. Since we have found against Harry on this argument, we must uphold respondent's determination. Challenge Manufacturing Co. v. Commissioner,37 T.C. 650, 663 (1962). *142 [27]
Issue 12
FINDINGS OF FACT AND OPINION Respondent has made various adjustments to depreciation deductions claimed by US Sales for its years ended 1970 through 1975 with respect to automobiles and other property. Most of these adjustments are due to changes in the depreciation method used, in the salvage value allowed, or in the personal use factor employed; as to these adjustments US Sales has presented no evidence, and respondent's determinations will therefore be upheld.Rule 142. US Sales disputes, and presented some evidence concerning, respondent's adjustments relating to US Sales' automobiles used by Harry and members of his family. US Sales contends that Harry and his family used these automobiles solely for business purposes, while respondent contends that the cars were used partially for personal purposes. Again, petitioner argues incorrectly that the disputed issues were settled by stipulation. The parties have stipulated to the personal use factor applicable to Harry's use of US Sales' automobiles, but it remains for us to determine the personal use factors applicable to members *143 of Harry's family. The record concerning the issue before us is woefully inadequate. Harry and various members of his family testified that they used company cars only for business purposes, and that they took the cars home at night only because they feared the cars would be vandalized if left in the company lot overnight. We were given no documentation of who drove which car when, or of total miles driven. It is unclear whether any employees of US Sales other than members of Harry's family took company cars home at night. Given the vagueness of the testimony in the record, and the lack of any substantiation, we conclude that the self-serving testimony of Harry, other members of his family and employees of US Sales, does not serve to carry petitioners' burden of proof on the question under consideration. Accordingly, respondent's determination will be upheld. Issue 13
FINDINGS OF FACT AND OPINION Respondent disallowed certain investment tax credits claimed by US Sales for its fiscal years ended 1972 through 1978. Petitioners presented no evidence directly related to this issue. They contend that the amount of investment tax credits properly allowable is a function *144 of our determination of the percentage of business use of US Sales' automobiles. We have upheld respondent's determinations concerning the business use of US Sales' automobiles, except where the parties have stipulated otherwise. In his deficiency notice, respondent adjusted the investment tax credit claimed by US Sales with respect to 14 automobiles purchased between 1972 and 1978. It is impossible to tell from the face of the schedules explaining the deficiency notice the uses to which these automobiles were put. It is possible that some of these automobiles were those the use of which by Harry and members of his family was discussed earlier in this opinion, but petitioners have failed to offer any evidence on this point; nor have they offered any independent evidence on the uses to which these automobiles were put. Respondent's determination on this issue will therefore be upheld. Rule 141(a). Issue 14
FINDINGS OF FACT AND OPINION During 1970, Louis Snyder (hereinafter Louis), Harry's son, attended Ithaca College in Ithaca, New York. He was then 18 years old. Louis took with him to college an American Express card, a Sun Oil credit card, and a Texaco Oil credit *145 card, all belonging to US Sales. Various travel and meal expenses charged to these credit cards by Louis were paid by US Sales during 1970 and deducted as business expenses. Section 274(d) provides that no deduction shall be allowed under section 162 for any traveling expense (including meals and lodging while away from home) unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement, the amount of such expense, the time and place of the travel, and the business purpose of the expense. Petitioners have failed to produce any evidence on this issue beyond Louis' testimony, and have therefore failed to satisfy the requirements of section 274 with respect to the amounts in issue. Respondent determined that expenses of Louis paid by US Sales in 1970 are includable in income by Harry as constructive dividends. [28] Petitioners have made no effort to show that respondent's determination is incorrect, and we must therefore uphold such determination. Rule 142(a). *146 Issue 15
FINDINGS OF FACT AND OPINION US Sales paid Louis $6,750 during the 1970 calendar year. The parties have agreed that only $600 of the amount paid in the first six months of 1970 is properly deductible by US Sales as a salary expense. For the remaining six months of 1970, the parties have agreed that only $1,370.75 is properly deductible by US Sales as a salary expense. We must determine whether Harry should be charged with a constructive dividend of $4,779.25 that US Sales paid to Louis but conceded not to be deductible as salary. Louis is the eldest son of Harry. During 1970 Harry paid Louis' tuition and his room and board at Ithaca College.On his 1970 return, Harry claimed Louis as a dependent. When a corporation pays unreasonable compensation to a relative of its 100 percent stockholders, such stockholder must show that the payment was not due to family considerations to avoid having the excess compensation charged to him as a constructive dividend. L. Schepp Co. v. Commissioner,25 B.T.A. 419, 429 (1932). The parties have agreed that $4,779.25 of the $6,750 paid by US Sales to Louis in 1970 was unreasonable compensation. On the record *147 before us, it appears likely that Harry had US Sales pay Louis compensation in excess of the value of Louis' services for family considerations; at least, the burden of proof is on petitioners to show otherwise, Rule 142, and they have failed to carry their burden. [29]
Accordingly, respondent's determination on this issue will be sustained. Issue 16
FINDINGS OF FACT AND OPINION Gary Snyder, Harry's youngest son, was born in 1952. In 1970, he was a high school student, and in 1971 and 1972 attended Dade Junior College in Miami, Florida. In the summers of 1970 and 1971, Gary was employed by Defense Marketing. He performed menial labor at the US Sales headquarters in Virginia Beach. Gary received salary payments throughout these years, even when he was in school. Defense Marketing claimed as deductions for salary paid to Gary $6,750, $7,600, and $10,750 for 1970, 1971 and 1972, respectively. *148 Under section 162(a)(1), a deduction is allowable to a corporation for "a reasonable allowance for salaries or other compensation for personal services actually rendered." Respondent disallowed as unreasonable compensation $2,928 for 1970, $4,857.50 for 1971, and $5,290 for 1972 paid by Defense Marketing to Gary Snyder and deducted by it as salary payments. The issue before us is whether these amounts constituted reasonable compensation. In order to be deductible, compensation must be both reasonable in amount and in fact paid purely for services. Sec. 1.162-7(a), Income Tax Regs. The question is one of fact to be determined by the particular facts and circumstances of each case, Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 567 (1974), affd. 528 F.2d 176 (10th Cir. 1975), and the burden of proof is on the taxpayer. Rule 142(a).A comprehensive list of factors to be considered is found in Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court. Although we discuss only those factors upon which we place the greatest reliance, our conclusion is the result *149 of evaluating the entire situation in light of all the factors. Gary Snyder was a high school and junior college student during the years in issue. The junior college he attended was in Florida, and the record contains no evidence beyond the possibly self-serving testimony of officers of US Sales that Gary did work for Defense Marketing while he was away at college. Petitioners argue that Gary served US Sales as vice president of corporate development during the years in issue. [30] To support this contention, petitioners cite on brief the testimony of US Sales executive vice president George Masters, comparing work done for US Sales by his son Georgie with the work done by Gary Snyder: Q Do you remember how much your son worked--how much he was paid when he was working there? A Minimum wage. Q Did he do the same type of things that Gary did?
A No, no, Georgie did a lot of menial labor. He helped around, just what a high school kid would do after school. According to petitioners, this testimony establishes that Gary Snyder did more than just menial labor. When George *150 Masters' testimony is considered in its entirety, however, it provides no support for petitioners' contention, for immediately following the aforementioned testimony, he testified: Q Was Gary a high school kid at that time? A Gary? Q Gary. A Yes, Gary was a high school kid. Q Did your son and Gary do the same type things? A Yes, I would say so. Considering the entire record, we cannot say that petitioners have met their burden of showing that respondent's determination on this issue was in error.Respondent's determination will therefore be upheld. Issue 17
FINDINGS OF FACT AND OPINION For its taxable years ended in 1970, 1971 and 1972, respectively, US Sales deducted $342, $900 and $600 for payments made for the care and feeding of riding horses. Respondent disallowed half of the claimed deduction for each of these years. The payments in question were made under an arrangement with the proprietor of a stable, whereby horses were made available for riding to employees of US Sales. All four of Harry's children rode these horses during the years in issue. US Sales contends that it is entitled to the full amount of deductions claimed; respondent contends *151 that section 274 mandates disallowance of the disputed amounts. Section 274(e)(5) provides a special rule for recreational expenses incurred primarily for the benefit of employees: (5) Recreational, etc., expenses for employees.--Expenses for recreational, social, or similar activities (including facilities therefor) primarily for the benefit of employees (other than employees who are officers, shareholders or other owners, or highly compensated employees). For purposes of this paragraph, an individual owning less than a 10-percent interest in the taxpayer's trade or business shall not be considered a shareholder or other owner, and for such purposes an individual shall be treated as owning any interest owned by a member of his family (within the meaning of section 267(c)(4)). Section 267(c)(4) provides that the family of an individual shall include his ancestors. Respondent admits that the amounts in issue represent expenses for recreational activities of US Sales employees, but argues that US Sales has failed to meet the substantiation requirement of section 1.274-5(c)(7)(ii), Income Tax Regs., which requires that-- a taxpayer shall keep such records or other evidence *152 as shall establish that such expenses were for activities (or facilities used in connection therewith) primarily for the benefit of employees other than employees who are officers, shareholders or other owners (as defined in section 274(e)(5)), or highly compensated employees. We agree. Petitioner US Sales did not supply us with a record of persons who rode the horses during the years in issue, or any other evidence that suffices to establish, as required by section 1.274-5(c)(7)(ii), Income Tax Regs., that the horse-related expenses were incurred primarily for the benefit of employees other than Harry's children. Petitioner US Sales argues that the amount in issue is insignificant, and that respondent is shooting a 16-inch gun at a sparrow. This argument is specious: respondent cannot be faulted for seeking to enforce the law. Since we have concluded that respondent has scored a direct hit on the issue before us, his determination will be upheld. Issue 18
FINDINGS OF FACT AND OPINION Respondent has charged as constructive dividends to Harry in 1970 and 1971 some of US Sales' disallowed horse-related expenses for its 1970, 1971 and 1972 fiscal years as follows: *153 Fiscal
Deducted by
Disallowed To
Calendar
Charged to
Year
US Sales
US Sales
Year
Harry Snyder
1970
$ 342
$171
1970
$360
1971
900
450
1971
360
1972
600
300
TOTAL
$1,842
$921
$720
We have found that all four of Harry's children rode the horses during 1970 and 1971. Expenditures made by a corporation for the personal benefit of members of its sole shareholder's family are includable in that shareholder's income as dividends. Challenge Mfg. Co. v. Commissioner,37 T.C. 650, 663 (1962). The burden is on Harry and Selma Snyder to establish that respondent's determination on the issue before us is incorrect. Rule 142. Since they make no argument beyond asserting that the horse-related deductions claimed by US Sales are allowable, we uphold respondent's determination, except that we hold that with respect to US Sales' 1970 fiscal year only the amount of horse-related expenses disallowed as a deduction by respondent, $171, may be included in Harry's income.
Issue 19
FINDINGS OF FACT AND OPINION During its 1971 and 1972 fiscal years, US Sales made payments to Squires 4 Racing Stables of $481.72 and $306.25, *154 respectively. In the post-trial stipulation US Sales conceded that it was not entitled to deduct the two payments made to Squires 4 Racing Stables. Respondent determined that these payments are includable in Harry's income for his 1971 taxable year as constructive dividends. Harry objects to this determination. Petitioners assert on brief that the payments in issue were erroneously deducted by US Sales, and were in fact made by Harry. They point to no evidence in the record supporting this assertion, nor have we found any such evidence. Petitioners also argue that Squires 4 Racing Stables was licensed to do business in the states in which it did business, and that Harry derived no personal enjoyment from his participation in Squires 4 Racing Stables. These arguments are irrelevant. The burden of proof is on petitioners to show that US Sales did not make payments on Harry's behalf to Squires 4 Racing Stables. Rule 142(a). Since petitioners presented no evidence on this point, they have failed to carry their burden of proof and respondent's determination will be unheld.
Issue 20
FINDINGS OF FACT AND OPINION On his 1971 individual income tax return, Harry claimed a *155 loss of $3,713.40 attributable to the Squires 4 Racing Stables joint venture. Respondent determined that only $1,866.59 of this claimed loss was allowable. Harry's testimony on this issue was vague, and no substantiation of the claimed losses was offered in evidence. Since the burden of proof on this issue is on Harry, Rule 142(a), we must once again uphold respondent's determination.
Issue 21
FINDINGS OF FACT AND OPINION On brief, respondent offers the following summary of the facts relevant to this issue: In 1965 or 1966, Harry and Selma Snyder purchased real property located at 305 Hilltop Road, Virginia Beach, Virginia. * * * The real property consisted of a three-story house with 20 rooms, including 10 bedrooms and 7 baths. The house was on a 1.6 acre lot. On the lot was a garage with an apartment over the garage. When the house and the garage apartment were purchased, they were in very poor condition. * * * The garage apartment first appears on the Snyders' income tax return in 1968. The garage is shown as having been acquired on July 1, 1966, at a cost of $25,000. On their 1969 return the Snyders claimed depreciation with respect to $5,381.62 in improvements *156 on the garage apartments which the return shows were made on April 1, 1969. On their return for the 1970 year, the petitioners continued to claim depreciation on the garage apartment with respect to both the cost of its acquisition and the improvements made in 1969. In the statutory notice of deficiencies issued to Harry and Selma Snyder for the 1970 year (docket No. 2670-81), respondent adjusted the cost basis of the apartment to $7,582.64 rather than the $25,000 claimed on the return. The respondent based his determination as to the basis of the garage apartment on the values placed on the garage, the house, and the land by the Virginia Beach Tax Assessor's Office. Based on those records, 6.32 percent of the cost of the acquisition of the whole property was attributed to the garage apartment. In addition to depreciation based on the cost of the garage apartment, respondent allowed the petitioners depreciation with respect to the $5,381.62 in improvements made on the garage apartment in 1969.Respondent also allowed the petitioners a deduction with respect to their 1970 return for $2,921.72 for repairs which were made to the garage apartment in that year. It is the contention *157 of the petitioners that the cost basis of the garage apartment was $25,000. Their rationale for adopting this valuation is incomprehensible and does not correspond to the facts. Harry Snyder testified that Exhibit 113 was the tax bills paid to the City Treasurer of Virginia Beach for Site A and Site B at 305 Hilltop Road. He stated that Site A represented the garage only. Harry Snyder testified further that he and his accountant, Mr. Lasky, determined the basis of the garage apartment by multiplying the total cost of the house and the repairs made to it by that percentage of the real estate tax which he claimed was attributable to the garage only. Harry Snyder testified that they determined from Exhibit 113 that 12 percent of the value of all of the property at Hilltop Road was attributable to the garage, and, therefore, the basis of the garage should be 12 percent of $250,000 or $24,000. When the Court pointed out that 12 percent of $250,000 was a good deal more than $24,000, Harry Snyder testified that 12 percent of $250,000 was $30,000, and that he and Mr. Lasky reduced the basis of the garage apartment by $5,000 to take into consideration the fact that the garage itself was *158 not rented. There are numerous holes in Harry Snyder's story. Exhibit 113 is two checks to the Treasurer of the City of Virginia Beach which bear notations which Harry Snyder explained showed the property tax paid on 305 Hilltop Road. These checks were both written in 1970. Since the $25,000 figure for the basis of the garage apartment first appeared on the 1968 income tax return of Harry and Selma Snyder, Exhibit 113 could not possibly have been used by Harry Snyder and Mr. Lasky to determine the basis of the garage apartment. Exhibit 111 shows that the property at 305 Hilltop Road consisted of Sites A and B of Block 119, a small portion of Old Street, Lots 18, 19, 21 and a small triangular parcel, as well as a portion of a 20-foot alley. Clearly, the tax assessments on Sites A and B cannot be used to accurately estimate the Snyders' basis in the garage apartment.Harry Snyder's testimony with respect to how he arrived at the basis assigned to the garage apartment is also belied by the fact that all of the repairs to the apartment and its remodeling occurred after the $25,000 basis was assigned to the property on the 1968 return. Selma Snyder, now Rayfield, testified that the *159 apartment was rented shortly after its remodeling was completed. The Snyders first reported receiving income with respect to the garage apartment on their 1969 return. Exhibit 112 is copies of a portion of the checks which Harry Snyder wrote for repairs and rehabilitation of the property at 305 Hilltop Road. On the check stubs are notations as to the purpose of each payment. The first check which bears a notation that it was in payment for remodeling or repair of the garage apartment bears the date November 1, 1968. It is obvious that when the $25,000 basis was assigned to the garage apartment on the Snyders' 1968 return, the garage apartment "was a shell with a roof on it." The ludicrous $25,000 basis was assigned to the garage apartment by Harry Snyder and Mr. Lasky before Selma Snyder "fixed it up" by providing it with air conditioning, heat, a kitchen, a bathroom, and three bedrooms. Petitioners have completely failed to provide the Court with any credible evidence through which the Court could assign a basis to the garage apartment other than that allowed by respondent. [Refs. omitted.] In the section of their reply brief devoted to the passage from respondent's brief *160 reproduced above, petitioners state that "[w]e differ at the conclusion of the respondent's brief.We adopt, however, all of the facts stated by the brief." After our review of the record, we agree with petitioners that respondent has accurately stated the facts pertinent to the garage depreciation issue. Petitioners' argument that we should reject the conclusion of respondent's brief, as best we can understand it, is based on the premise that respondent bears the burden of supporting his determinations. This premise is erroneous, for the burden of proof is upon the petitioners. Rule 142(a). Petitioners having failed to carry their burden. respondent's determination will be upheld. Issue 22
FINDINGS OF FACT AND OPINION Sometime during 1970, Harry received a bill dated March 31, 1970, from Farr Construction Company for work performed in the construction of the building located on the Barrett Street property. The bill included a $10,000 charge for site work. In calculating depreciation allowable on the Barrett Street building for his taxable years 1970-1977, Harry included this $10,000 item in his basis in the building. The parties dispute the characterization appropriate *161 to this site work, petitioners contending it was directly associated with the construction of the building; respondent contending tht it was not directly associated with the building's construction but simply added value to the land, and therefore that its cost may not be included in Harry's basis in the Barrett Street building.
Should we agree with petitioners' characterization of the site work, it follows that its cost was properly included in the basis of the Barrett Street building for purposes of calculating depreciation, section 1.167(a)-2, [31] Income Tax Regs. If we find otherwise, respondent's determinations on this issue must be upheld. Algernon Blair, Inc. v. Commissioner,29 T.C. 1205, 1220-1221 (1958). As usual, the petitioner bears the burden of proof, Rule 142(a).
The only evidence offered by Harry was a site plan of the Barrett Street building prepared by the architects and his testimony that the charge for site work represented work on the foundation of the building. Unfortunately for Harry the architects' site plan does not contain enough information to be helpful in deciding the *162 issue before us. Harry's possibly self-serving testimony is insufficient to carry his burden of proof on the issue before us, particularly where, as here, Harry's counsel stated at trial that one of the architects and the engineer who supervised the building were available to testify, and then failed to call either of them. Under these circumstances we must assume that had these individuals testified their testimony would have been harmful to Harry's position. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 165 F.2d 513 (10th Cir. 1947). [32] Based on the foregoing, and the entire record, we find and hold tht Harry has not met his burden of proof. Respondent's determination will therefore be upheld. Issue 23
FINDINGS OF FACT AND OPINION During the years in issue, US Sales gave Christmas parties for its employees and some of its customers. Respondent disallowed a deduction of $1,475.38 claimed by US Sales for the Christmas party in its fiscal year *163 ended in 1977. Section 162(a) provides for the deduction of ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. US Sales contends that the expenses of its 1977 Christmas party are deductible under section 162, while respondent argues that such expenses are not deductible because US Sales has failed to meet the substantiation requirements of section 274. The burden of proof is upon US Sales. Rule 142(a). Petitioner failed to introduce substantiation adequate to meet the requirements of section 274. It argues, however, that the exception provided in section 274(e)(2) [33] to the general rule of section 274 applies to the expenses in issue. We cannot agree. Section 274(e)(2) applies only to the cost of food and beverages furnished on the premises of the employer primarily for its employees. Petitioner introduced testimony that customers of US Sales were invited to its Christmas parties, without going into enough detail for us to determine if the parties were primarily for employees or for customers. Additionally, one of US Sales' witnesses testified that US Sales usually held its Christmas parties away from its business *164 premises. US Sales has thus failed to carry its burden of proving that its Christmas party expense for its fiscal year ended in 1977 falls within the exception to section 274 specified in section 274(e)(2). Since, as noted above, US Sales failed to produce substantiation of the expense in issue adequate to meet the requirements of section 274, respondent's determination will be upheld. *165 Issue 24
FINDINGS OF FACT AND OPINION Respondent determined that the Christmas party expense improperly deducted by US Sales in its fiscal year ended in 1977 should be included in Harry's 1977 income as a constructive dividend. Harry bears the burden of proof on this issue. Rule 142(a). Since he presented no evidence on this issue, respondent's determination will be upheld. Issue 25
FINDINGS OF FACT AND OPINION For its fiscal years ended in 1976 and 1977, US Sales claimed deductions for fruits and flowers and for hams and beverages, all of which were allegedly given out at Christmas time to employees and customers. Respondent challeges the 1976 deduction of the fruits and flowers expense on the ground that in part it was not an ordinary and necessary business expese within the intendment of section 162. [34] The hams and beverages deduction for 1976 and the 1977 deductions were disallowed under section 274. Harry and a US Sales employee unrelated to him testified that fruit baskets and flowers were given to employees *166 and customers of US Sales each year to promote goodwill. Although this testimony was lacking in specificity, the witnesses were credible on this point and we are satisfied that the cost of fruit baskets and flowers given out in US Sales' fiscal year ended in 1976 was an ordinary and necessary business expense within the intendment of section 162. Since respondent has not suggested that the requirements of section 274 were not met with respect to the fruit baskets and flowers given out in US Sales' 1976 fiscal year, the deductions claimed by US Sales for fruit and flowers expenses in that fiscal year will be allowed in full. Respondent has asserted that the requirements of section 274 have not been met by US Sales with respect to deductions claimed for hams and beverages expenses in its 1976 and 1977 fiscal years and fruits and flowers expenses in its 1977 fiscal year. Section 274(d) provides that no deduction shall be allowed for any expense for gifts unless the taxpayer substantiates by adequate records, or by sufficient evidence corroborating his own statement, the amount of the expense, the date and description of the gift, the business purpose of the gift, and the business *167 relationship to the taxpayer of the persons receiving gifts. The only evidence presented by US Sales concerning the years in issue was the testimony of various employees that hams and beverages and fruits and flowers were given out. No attempt was made to meet the substantiation requirements of section 274(d), and respondent's determination concerning the expenses in question will therefore be upheld. [35]
Issue 26
FINDINGS OF FACT AND OPINION In the statutory notice of deficiency issued to Harry and M. Wilroy Snyder for taxable years 1975, 1976 and 1977, respondent determined that payments made by US Sales for flowers and fruit and hams and beverages were includable in Harry's income as constructive dividends in the following amounts: 1975
1976
1977
Flowers and fruit
$58.40
$181.35
Hams and beverages
423.67
We have determined that the full amount of the deduction for flowers and fruit *168 claimed by US Sales for its 1976 fiscal year is allowable; it follows that no portion of this amount may be included in Harry's income. The only argument offered by Harry concerning the other amounts is that these, too, were properly deductible by US Sales. We have found to the contrary. Harry having offered no other argument on this point, and the burden of proof falling on Harry, Rule 142(a), respondent's determination with respect to the remaining amounts will be upheld. Issue 27
FINDINGS OF FACT AND OPINION In the notice of deficiency in docket No. 21799-80 respondent disallowed maintenance fees and depreciation claimed by US Sales with respect to a condominium located at 3800 Ocean Front, Virginia Beach, Virginia, in the amounts of $3,327.74 and $3,788 for its 1976 and 1977 fiscal years, respectively. These disallowed expenses respondent included in Harry and M. Wilroy Snyder's income as constructive dividends in their taxable years 1976 and 1977. In the post-trial stipulation the parties agreed the US Sales was entitled to deduct all of the maintenance fees and depreciation which it had claimed on its 1976 fiscal year return, and was entitled to deduct only 25 *169 percent (or $947) of the maintenance fees and depreciation claimed on its 1977 fiscal year return. Respondent conceded in the post-trial stipulation that no adjustment should be made to income of Harry L. and M. Wilroy Snyder for the 1976 calendar year with respect to the condominium located at 3800 Ocean Front. The only issue still in dispute is whether Harry and M. Wilroy Snyder should be charged with a constructive dividend of $2,841 in the calendar year 1977 with respect to the condominium at 3800 Ocean Front. In their brief, filed after the filing date of the post-trial stipulations in which the above-noted settlements were reached, petitioners contend that US Sales is entitled to the entire deduction it claimed for maintenance and depreciation of the 3800 Ocean Front condominium for its 1977 taxable year. We are loath to upset the settlements reached by the parties, and we do not. If we were willing to consider this issue, however, we would be forced to conclude US Sales had not submitted sufficient evidence to carry its burden of proof on this point. Rule 142(a). Petitioners presented no other argument that Harry and M. Wilroy Snyder should not be charged with a *170 constructive dividend of $2,841 for their 1977 taxable year. We conclude that petitioners have failed to carry their burden of proof on this issue, Rule 142(a); accordingly, respondent's determination will be upheld. Issue 28
FINDINGS OF FACT AND OPINION In the notice of deficiency for docket No. 3445-80, respondent determined the sales tax deduction allowable to Harry and M. Wilroy Snyder for their taxable years 1975, 1976 and 1977, on the assumption that they spent seven months of each year in Florida and five months in Virginia. Petitioners bear the burden of proving that respondent was in error in so assuming. Rule 142(a). Since petitioners have failed to introduce evidence sufficient to allow us to determine how their time was allocated between the two states during the years in issue, respondent's determination will be upheld. Issue 29
FINDINGS OF FACT AND OPINION Respondent made numerous adjustments in addition to those discussed above and those settled by the parties. As usual, petitioners bear the bruden of proof with respect to such adjustments. Rule 142(a). Petitioners presented no evidence on these adjustments, and made no argument concerning *171 them on brief. [36] Respondent's determinations will therefore be upheld, since petitioners have evidently abandoned these adjustments, and in any event have failed to carry their burden of proof with respect thereto. Issue 30
FINDINGS OF FACT AND OPINION Respondent has assessed the section 6635(a) addition to tax against all the petitioners for all taxable years at issue.Section 6653(a) provides for an addition to tax if "any part of any underpayment * * * of any [income] tax * * * is due to negligence or intentional disregard of rules and regulations." Petitioners bear the burden of proving that the additions to tax do not apply. Luman v. Commissioner,79 T.C. 846, 860-861 (1982); Bixby v. Commissioner,58 T.C. 757, 791 (1972); *172 Rule 142(a). To meet their burden, petitioners argue that they relied upon the advice of a professional return preparer, Mortimer Lasky, C.P.A. As petitioners suggest, a showing by a taxpayer of good faith reliance on advice of a professional suffices to meet his burden of proving he was not negligent within the intendment of section 6653(a). Conlorez Corp. v. Commissioner,51 T.C. 467 (1968); Woodbury v. Commissioner,49 T.C. 180 (1967). The mere fact that petitioners used a professional return preparer does not without more insulate them from the section 6653(a) additions to tax, Enoch v. Commissioner,57 T.C. 781 (1972), [37] for they must still show that the advice of the professional was based on all of the facts. Leonhart v. Commissioner,414 F.2d 749 (4th Cir. 1969), affg. a Memorandum Opinion of this Court. This we do not believe petitioners have done. Respondent's assertion of the negligence addition is founded on his claim that throughout the years *173 in issue Harry caused US Sales and Defense Marketing to pay, and deduct as business expenses, expenses personal to him. [38] We have upheld many of respondent's disallowances of deductions claimed by US Sales on the ground that US Sales was unable to establish that the expenses in issue were not personal expenses of Harry, and petitioners have conceded many more such disallowances. Petitioners have introduced no evidence that Mortimer Lasky was aware of the facts and circumstances of these various claimed deductions, that he ever advised US Sales or Defense Marketing it was proper to claim such deductions, or that he advised that Harry recognized no income from having personal expenses paid by US Sales or Defense Marketing. [39] Based on the foregoing, and the entire record, we find and hold that petitioners have failed to carry their burden of proving they are not liable for the section 6653(a) additions to tax. Accordingly, respondent's determination on this issue will be upheld. [40]
*174 Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: United States Sales Corporation, docket No. 21799-80; Defense Marketing Corporation, docket No. 21800-80; Defense Marketing Corporation, docket No. 2537-81; Harry L. Snyder, docket No. 2541-81; Harry L. and Selma O. Snyder, docket No. 2670-81; and United States Sales Corporation, docket No. 2705-81.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. The record is silent as to whether L. Snyder's ever owned or operated this parking lot.↩
4. A typical letter read as follows: Merchandising and Marketing Since 1894 SNYDER'S
Division of United States Sales Corporation * * * November 12, 1973 * * * Dear Mr. Wit: Attached to this letter is a copy of a letter that was mailed out to selective softgoods manufacturers in the United States. Snyder's is a division of U.S. Sales Corporation concentrating 100% on textiles and fashion merchandise. We have been selling and servicing the military market for 27 years under U.S. Sales Corporation in the hardlines field, and are confident our success will grow in the Snyder's division. We are attaching a list of U.S. Sales principal references and, as you can see, our credentials speak for themselves. A brochure is also enclosed, introducing you to our company and the many services we offer. We would certainly welcome the opportunity to discuss with you the roll Snyder's plays in servicing the military market. I plan to be in New York the first week of December and would like to set up an appointment with you, if convenient. Kindly let me know if you will be available and a day and time that will fit into your busy schedule. Looking forward to hearing from you, I remain, Sincerely yours, GEORGE W. MASTERS, Vice President - Sales↩
5. Petitioners contend, as best we can understand them, that Harry, US Sales, and Ben Paul Snyder, Harry's father, together owned over 50 percent of L. Snyder's shares as of December 1967, and therefore did not acquire control, for purposes of section 269, during the years in issue. Even if petitioners' factual premise is correct, the conclusion sought by them does not follow, since the attribution rules of sections 267 and 318 do not apply to section 269. Thomas E. Snyder Sons Co. v. Commissioner,288 F.2d 36 (7th Cir. 1961), cert. denied 368 U.S. 823 (1961); Brick Milling Co. v. Commissioner,T.C. Memo. 1963-305; see also Dorba Homes, Inc. v. Commissioner,403 F.2d 502, 506 (2d Cir. 1968), affg. in part, revg. in part, and remanding a Memorandum opinion of this Court. Compare Ach v. Commissioner,42 T.C. 114 (1964), affd. 358 F.2d 342 (6th Cir. 1966), cert. denied 385 U.S. 899↩ (1966). We note that petitioners neither argued, nor presented any evidence tending to show, that Ben Paul Snyder's shares of L. Snyder's were beneficially owned by Harry or US Sales. We have assumed, without so finding, that the L. Snyder's shares owned by US Sales were beneficially owned by Harry.
6. A typical letter contained the following: Snyder's is a division of U.S. Sales Corporation concentrating 100% on textiles and fashion merchandise. We have been selling and servicing the military market for 27 years under U.S. Sales Corporation in the hardlines field, and are confident our success will grow in the Snyder's division. We are attaching a list of U.S. Sales principal references and, as you can see, our credentials speak for themselves.* * *↩
7. A letter dated January 15, 1971, from Mortimer Lasky, C.P.A., to Harry Snyder, president of US Sales, includes the following language: "This has been a most difficult merger because of * * * the protection of the large operating loss carryover."↩
8. Respondent concedes that if we find that these payments constituted dividends to Harry, he is entitled to an offsetting deduction. Sec. 215.↩
9. Payments made by US Sales after Selma's separation from Harry and prior to their agreement of February 4, 1971, were obviously not made pursuant to that agreement. US Sales presented no evidence that these payments were an ordinary and necessary expense and were not made to satisfy a personal obligation of Harry's, except as noted above, and we therefore find and hold that US Sales has failed to meet its burden of proof with respect to these payments, as well as the payments explicitly made under the agreement between Selma and Harry.↩
10. Harry also claimed on brief that he is entitled to deduct $2,500 he paid for fees incurred by the attorney who represented his wife in the divorce.Harry likewise offered no admissible evidence on this issue, and thus may not prevail thereupon.↩
11. The sublease also included a private office at $1,200 per year, the square footage of which is not given.↩
12. Cf. Mark R. Switz, Inc. v. Commissioner,T.C. Memo. 1979-162↩. 13. Consolidated Appeal Co. v. Commissioner,17 T.C. 1570 (1952), was reversed on this point 207 F.2d 580 (7th Cir. 1953), but on the rationale that the taxpayer corporation involved therein did receive adequate consideration for accepting a new lease. 207 F.2d at 583↩.
14. "The lease will be in the amount of $3,000 per month, payable to Mr. Harry L. Snyder, owner. Saul & Alexander M. Salzberg & Company, Alexander Salzberg, appraiser, valued the land at 4.9 acres at $15,000 per acre * * * [t]he value of the building and improvements was $307,215."↩
15. This case is distinguishable from Levenson & Klein, Inc. v. Commissioner,67 T.C. 694 (1977). In that case the lessee corporation received consideration for accepting a less advantageous lease, and the parties stipulated that the new lease was reasonable in amount. 67 T.C. at 719↩. Neither of these factors is present in the instant case.
16. Respondent's expert, net return = $37,366; petitioner's expert, net return = between $38,190 and $39,790.↩
17. Thus the amount deductible for calendar year 1976 may be calculated as follows: $69,000 + ($69,000 X 8/100) - ($14,693 + [$14,693 X 8/100]) - $7,200 = $51,451.56, or $4,287.63 per month.↩
18. The record is unclear as to the amounts paid for each category of benefits mentioned in the above-cited arrangement.↩
19. Section 105 provides in pertinent part: (a) Amounts Attributable to Employer Contributions.--Except as otherwise provided in this section, amounts received by an employee through accident or health insurance for personal injuries or sickness shall be included in gross income to the extent such amounts (1) are attributable to contributions by the employer which were not includible in the gross income of the employee, or (2) are paid by the employer. (b) Amounts Expended for Medical Care.--Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include amounts referred to in subsection (a) if such amounts are paid, directly or indirectly, to the taxpayer to reimburse the taxpayer for expenses incurred by him for the medical care (as defined in section 213(e)) of the taxpayer, his spouse, and his dependents (as defined in section 152).↩
20. We concluded that the plans in issue were "for employees" in Wigutow v. Commissioner,T.C. Memo. 1983-620; Giberson v. Commissioner,T.C. Memo. 1982-338; Epstein v. Commissioner,T.C. Memo. 1972-53; Seidel v. Commissioner,T.C. Memo. 1971-238; Smith v. Commissioner,T.C. Memo. 1970-243; and Bogene, Inc. v. Commissioner,T.C. Memo. 1968-147. The contrary result was reached in Levine v. Commissioner,50 T.C. 422 (1968); Larkin v. Commissioner,48 T.C. 629 (1967), affd. 394 F.2d 494 (1st Cir. 1968); John H. Kennedy, Inc. v. Commissioner,T.C. Memo. 1977-210; Charlie Sturgill Motor Co. v. Commissioner,T.C. Memo. 1973-281; and Smithback v. Commissioner,T.C. Memo. 1969-136↩.
21. A US Sales promotional brochure offered in evidence by petitioners contains the following job descriptions for the above-named executives: Harry Snyder likes his job as skipper of the burgeoning multimillion dollar organization. Anything we do today must be wrong because we're still doing it that way, is his motto. He is an innovator, a firm believer that communication is synonymous with speed and proves this daily by using the latest electronic business equipment to help his staff do a job better and faster than competition. * * * Constantly searching for a new and better approach to problems, Harry Snyder is knowledgeable in all facets of the exchange structure. He has depth in serving both seller and buyer, and believes in pounding the beat by calling on accounts. This, he says, gives him a grass roots feel for the needs of exchanges and their customers. An almost cynically-pure adult in today's business structure, he has a pulse for the market, a heart for his employees, and a sound head for business?. DONALD G. WIZEMAN, Senior Vice President was formally [sic] general manager and subsequently director of marketing for the firm. * * * He is responsible for military resale marketing, manufacturer's liaison and programming, and general supervision of UNITED STATES SALES operations. Mr. Wizeman develops the "Military Sales Programs" with our principals, that are so essential to the success of product and line introduction into this vast area of marketing. GEORGE W. MASTERS, Vice President--Sales, * * * George has complete control of our entire external sales force; domestic, offshore and overseas. He visits Headquarters Army and Air Force Exchange Service in Dallas, Texas, and also U.S. Navy Resale Systems Office in Brooklyn, N.Y. as our principal contract with all headquarters buyers. George calls on individual exchanges and support centers, and trains our sales force in their assigned territories. ↩
22. John H. Kennedy, Inc.,supra; compare Giberson,supra,↩ where the corporation paid two-thirds of the cost of medical insurance for all non-shareholder employees. 23. Compare Seidel,supra,Epstein,supra, and Bogene, Inc.,supra,↩ in all of which we relied on the fact that shareholders covered by the plans in issue did not benefit from such plans in proportion to their shareholdings.
24. Harry failed, e.g., to present any evidence tending to show that the amount of insurance on his life was provided under a plan of group insurance based upon a formula which precluded individual selection of such amount.↩
25. Petitioners have neither argued, nor offered evidence establishing, that the payments in issue constituted reasonable compensation to Harry. Larkin,supra; compare American Foundry v. Commissioner,59 T.C. 231, 243-245, affd. in part and revd. in part 536 F.2d 289 (9th Cir. 1976), and Charlie Sturgill Motor Co.,supra.↩
26. Respondent has conceded that US Sales is entitled to deduct $34.39 for automobile insurance premiums paid with respect to Louis Snyder for fiscal year 1971 in addition to the amount allowed in the notice of deficiency. For the 1972 fiscal year, respondent has conceded that US Sales is entitled to deduct $69.40 of the insurance premiums paid in addition to the amount previously allowed in the notice of deficiency. Respondent has also conceded that no part of the insurance premiums with respect to Gary Snyder deducted by US Sales on its 1970 and 1971 fiscal year returns should be disallowed as deductions.↩
27. See Shannon v. Commissioner,T.C. Memo. 1976-304↩.
28. On brief, petitioners state that they conceded the amounts in question in a post-trial stipulation, and that the parties further agreed that expenses incurred by Louis and paid by US Sales would be includable in income by Louis rather than by Harry.The Stipulation to which petitioners refer does not include the amounts here in issue.↩
29. Petitioners argue that the parties stipulated that unreasonable compensation paid to Louis would not be included in Harry's income as a constructive dividend. The stipulation to which petitioners refer does not cover the includability in Harry's income of the payments in issue.↩
30. Petitioners evidently view US Sales and Defense Marketing as interchangeable entities.↩
31. See also Rev. Rul. 65-265, 1965-2 C.B. 52↩.
32. Aurora Village Shopping Center, Inc. v. Commissioner,T.C. Memo. 1970-39; Mahigel v. Commissioner,T.C. Memo. 1983-529↩.
33. Sec. 274(e) Specific Exceptions to Application of Subsection (a).--Subsection (a) shall not apply to-- * * * (2) Food and beverages for employees.-- Expenses for food and beverages (and facilities used in connection therewith) furnished on the business premises of the taxpayer primarily for his employees. On brief petitioner quoted a passage from the CCH explanation of the regulations as if he were citing the sec. 274 regulations. Elsewhere on brief petitioner quoted a CCH headnote to one of our Memorandum Opinions as if he were citing the case itself. While CCH explanations and headnotes are doubtless valuable to the tax bar, we believe that petitioner's practice of treating CCH explanations and headnotes as interchangeable with respondent's regulations and our cases does not well serve the interests of efficient judicial administration.↩
34. US Sales claimed a deduction for flowers and fruit of $376.65 for its 1976 fiscal year. Respondent disallowed $58 of this amount.↩
35. Petitioners also argue that the deductions in issue should be allowd because respondent allowed similar deductions in other years. This argument is without merit. Benson v. Commissioner,80 T.C. 789, 804↩ n. 10-11 (1983).
36. Petitioners contend on brief that a $655 expense disallowed Defense Marketing and a $960.04 commission expense disallowed either Defense Marketing or US Sales by respondent are allowable. Petitioners presented evidence in their brief to support these contentions. Since the record proper is devoid of any evidence on these issues, however, petitioners have failed to meet their burden of proof with respect thereto.↩
37. Finestone v. Commissioner,T.C. Memo. 1960-164; A.C. Enginnering Corp. v. Commissioner,T.C. Memo. 1958-147↩.
38. We have held that "the deduction by a corporation of personal expenditures as business expenses is clearly negligence." Finney v. Commissioner,T.C. Memo. 1980-23↩.
39. We doubt that any competent return preparer, fully apprised of the facts, would so have advised petitioners. ↩
40. Petitioners make one other argument which is easily disposed of; namely, that they were not negligent because respondent was negligent in including in the deficiency notices various determinations which were later conceded to be incorrect. Even if petitioners are correct in asserting that respondent was negligent (we not that we could verify this assertion only if we knew now much information respondent possessed when the deficiency notices were issued), it hardly follows that petitioners are thereby immunized against the section 6653(a) additions to tax. The statute makes the additions to tax turn on the taxpayer's conduct, not the respondent's, and petitioners' argument is therefore without merit.↩